182 F.3d 408 (6th Cir. 1999)
 UNITED STATES OF AMERICA, PLAINTIFF-APPELLEE,
v.
ANTHONY GIBBS (96-3383); RICHARD HOUGH (96-3384); DONNETO BERRY (96-3385); CHAD GIBBS (96-3386); ROBERT CURTIS (96-3387); LAMONT NEEDUM (96-3388); ANTWAN WOODS (96-3402), DEFENDANTS-APPELLANTS.
 Nos. 96-3383 to 96-3388, 96-3402
 U.S. Court of Appeals, Sixth Circuit
 Argued: January 27, 1999
Decided April 16, 1999
As Amended on Denial of Rehearing and Suggestion for Rehearing En Banc July 13, 1999.
 
 Appeal from the United States District Court for the Southern District of Ohio at Columbus. No. 95-00044-George C. Smith, District Judge.[Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 David J. Graeff (argued and briefed), Columbus, Ohio, for Defendant-Appellant Anthony Gibbs.
 Spiros P. Cocoves (argued and briefed), Toledo, Ohio, for Defendant-Appellant Richard Hough.
 Stephen R. Felson (argued and briefed), Felson & Felson, Cincinnati, Ohio, for Defendant-Appellant Donneto Berry.
 Kevin P. Durkin (argued and briefed), Durkin & Brown, Columbus, Ohio, for Defendant-Appellant Chad Gibbs.
 W. Kelly Johnson, Assistant Federal Public Defender, Cincinnati, Ohio, Beth G. Lewis (argued and briefed), Office of the Federal Public Defender, Dayton, Ohio, for Defendant-Appellant Robert Curtis.
 Joseph D. Reed (argued and briefed), Columbus, Ohio, for Defendant-Appellant Lamont Needum.
 Dennis C. Belli (argued and briefed), Columbus, Ohio, for Defendant-Appellant Antwan Woods.
 Terry Lehman (briefed), Office of the U.S. Attorney, Cincinnati, Ohio, Salvador A. Dominguez (briefed), Office of the U.S. Attorney, Columbus, Ohio, Joseph C. Wyderko (argued and briefed), Department of Justice, Criminal Division, Appellate Section, Washington, DC, for Plaintiff-Appellee.
 Before: Merritt and Moore, Circuit Judges; Duggan,[1] District Judge.
 OPINION
 Karen Nelson Moore, Circuit Judge.
 
 
 1
 These seven defendants were all indicted under a single conspiracy count and individual drug and firearm counts. The government alleged that each of the defendants was a member of a group known as the Short North Posse, a group allegedly formed in 1989 in the Short North area of Columbus, Ohio to control local sales of cocaine base by excluding from the area drug dealers who were not residents of the Short North. A jury convicted each of the named defendants on the conspiracy count and on individual drug trafficking counts, and convicted a number of the defendants on firearm counts.
 
 
 2
 We AFFIRM in part, REVERSE in part, VACATE in part, and REMAND for further proceedings consistent with this opinion.
 
 I. FACTS AND PROCEDURE
 
 3
 In 1990, after a friend was shot in a drug trafficking incident, Robert Dotson and Marshon Mays decided to band together to form a group that would offer protection to its members in the area directly north of downtown Columbus, Ohio. This area was known as the Short North, and the group dubbed itself the Short North Posse ("SNP") or the 4th Street Posse.
 
 
 4
 The government alleges that the goal of the group was to prevent anyone not living in the Short North from selling cocaine base ("crack cocaine" or "crack") there without permission. The government contends that the Short North Posse achieved this goal through threats and intimidation. The state and federal governments conducted an extensive undercover investigation,headed by Agent Rodney Russell of the Bureau of Alcohol, Tobacco and Firearms, that included a large number of controlled buys of crack cocaine. In March 1995 the grand jury handed down a 185-count indictment against forty-one defendants. Count 1 of the indictment alleged that all forty-one of the defendants:
 
 
 5
 "did knowingly, intentionally and unlawfully combine, conspire, confederate and agree together with each other, and with diverse other persons, both known and unknown to the Grand Jury, to possess with the intent to distribute and to distribute cocaine and more than 5 grams of cocaine base, commonly referred to as crack, Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 21 U.S.C. 841(b)(1)(C) and 841(b)(1)(B)(iii)."
 
 
 6
 J.A. at 125 (Indictment).
 
 
 7
 The seven defendants here on appeal pleaded not guilty, and their cases were consolidated for trial. The bulk of the government's evidence consisted of testimony from cooperating witnesses, most of whom were alleged members of the SNP who had pleaded guilty. Other relevant evidence came from undercover officers and non-SNP drug dealers or users.
 
 
 8
 The other counts charged individual defendants with, among other things, drug trafficking and firearms violations, including possession with intent to distribute crack in violation of 21 U.S.C. § 841, distributing crack in violation of 21 U.S.C. § 841, and using or carrying firearms during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c).
 
 
 9
 The jury convicted all seven of these defendants of the conspiracy charged in Count 1. Each of the defendants was also convicted of separate drug trafficking and firearms crimes. Defendant Curtis was convicted of possession with intent to distribute crack (Count 102) and using a firearm during and in relation to a drug trafficking crime (Count 103). Defendant Chad Gibbs was convicted of possession with intent to distribute crack (Count 46) and of distributing crack (Counts 91, 109, 148, 154, 160, 184, and 185). Defendant Needum was convicted of possession with intent to distribute crack (Counts 47 and 102), distributing crack (Counts 92 and 96), and using or carrying a firearm during and in relation to a drug trafficking crime (Counts 97 and 103). Defendant Anthony Gibbs was convicted of possession with intent to distribute crack (Counts 55, 132, and 182), using or carrying a firearm during and in relation to a drug trafficking crime (Count 133), and distributing crack (Count 119). Defendant Woods was convicted of distributing crack (Count 125), possession with intent to distribute crack (Count 146), and using or carrying a firearm during and in relation to a drug trafficking crime (Count 147). Defendant Hough was convicted of possession with intent to distribute crack (Count 81) and using or carrying a firearm during and in relation to a drug trafficking crime (Count 82). And finally, defendant Berry was convicted of possession with intent to distribute crack (Count 151). The jury acquitted an eighth defendant, Jimmie Reed, of the conspiracy charge (Count 1). See Trial Tr. at 4041. Each of these seven defendants filed a timely notice of appeal, and their cases were consolidated on appeal before this court. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.
 
 II. ANALYSIS
 A. Sufficiency of the Evidence
 
 10
 The defendants challenge for sufficiency of the evidence both the conspiracy count and certain of their individual drug counts. Each is discussed separately and in turn below.
 
 1. Standard of Review
 
 11
 "When reviewing a claim of insufficient evidence, we examine the evidence in the light most favorable to the government and draw all inferences in the government's favor in order to determine whether any rational trier of fact couldhave found the elements of the offense beyond a reasonable doubt." United States v. Maliszewski, 161 F.3d 992, 1005 (6th Cir. 1998) (quoting United States v. Riffe, 28 F.3d 565, 567 (6th Cir. 1994)). See also Jackson v. Virginia, 443 U.S. 307, 319 (1979). We need not "exclude every reasonable hypothesis but guilt." United States v. Avery, 128 F.3d 966, 971 (6th Cir. 1997).
 
 2. Conspiracy Count
 
 12
 a. Existence of a Conspiracy
 
 
 13
 Each defendant challenges the existence of the alleged conspiracy under 21 U.S.C. § 846 to distribute crack cocaine as prohibited by 21 U.S.C. § 841. In order to show a conspiracy under § 846, the government must prove, beyond a reasonable doubt, "(1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy." United States v. Welch, 97 F.3d 142, 148 (6th Cir. 1996), cert. denied, 519 U.S. 1134 (1997).
 
 
 14
 The government argues that the SNP is a drug conspiracy. The defendants concede that they were street-level crack dealers, but they contend that the SNP was merely a neighborhood identification of a loose-knit group of friends and acquaintances, most of whom grew up in the Short North area. The SNP was not a gang, they claim, and more importantly, it was not a drug conspiracy. There was no business-like distribution network, hierarchy of leadership, or organization of members. The different members of the SNP claim to have sold their drugs independently of one another, choosing their own locations, price points, and working hours. The government is left, argue the defendants, with a claim akin to an antitrust-like restraint of trade.
 
 
 15
 An agreement need not be express to form a conspiracy, however, and the fact that the SNP had no hierarchy and was not run like a business does not make the finding of a conspiracy legally impossible. "A tacit or mutual understanding among the parties is sufficient," United States v. Forrest, 17 F.3d 916, 918 (6th Cir.), cert. denied, 511 U.S. 1113 (1994), to qualify as an agreement in a conspiracy charge. No formal agreement is required. See Avery, 128 F.3d at 970-71; United States v. Sanchez, 928 F.2d 1450, 1457 (6th Cir. 1991). The defendants' focus on lack of hierarchy, formal structure, and developed distribution networks certainly establishes that the SNP was less than a sophisticated narcotics business, but no threshold level of organizational sophistication is necessary to the formation of a conspiracy. A conspiracy requires: "(1) An object to be accomplished. (2) A plan or scheme embodying means to accomplish that object. (3) An agreement or understanding between two or more of the defendants whereby they become definitely committed to cooperate for the accomplishment of the object by the means embodied in the agreement, or by any effectual means." United States v. Bostic, 480 F.2d 965, 968 (6th Cir. 1973).
 
 
 16
 The government has presented enough evidence in this case for a jury to find that there was a tacit agreement among at least some of the individuals named in the original indictment to prevent drug dealers who did not live in the Short North, or who were not known to drug dealers in the Short North, from selling drugs in the Short North. Although there is little evidence that these drug dealers acted in furtherance of this agreement, such evidence is not necessary to prove such an agreement, and overt acts are not needed to prove a conspiracy under § 846. See United States v. Shabani, 513 U.S. 10, 15 (1994). Moreover, at least one witness testified that he actually saw drug dealers from the Short North beat up a non-resident drug dealer for selling drugs in the Short North. See J.A. at 920 (Test. of Gladden).
 
 
 17
 The government based its claim of a conspiracy on this tacit agreement to keep other drug dealers out of the Short North. The jury could find that the objective of the agreement was to facilitate and protect the drug sales of the dealers in the Short North. Although the Short North Posse itself may have been formed primarily to protect its members from outsiders, there is enough evidence for a jury to find that there was also an implicit agreement among local drug dealers, whether or not members of the Short North Posse, to exclude outside drug dealers from competing for sales in the Short North. A number of witnesses testified that anyone attempting to sell drugs in the Short North without being a resident of the Short North or without obtaining implicit or explicit permission from the other dealers would be forced out by violence or intimidation. See J.A. at 1007 (Test. of Berger); J.A. at 708-09 (Test. of Clausell); J.A. at 1645-46 (Test. of Crockett); J.A. at 1264 (Test. of Terry); J.A. at 1567 (Test. of Crenshaw).
 
 
 18
 Although the agreement forming the basis of this conspiracy is unusual, and does resemble a restraint of trade, the existence of a drug conspiracy based on monopolistic conduct is not novel. Cf. United States v. Richardson, 130 F.3d 765, 773-74 (7th Cir. 1997) (where the objective was monopolizing and controlling sales in a section of Chicago), cert. denied, --- U.S. ---, 119 S. Ct. 39 (1998). We hold that there was sufficient evidence of an agreement between certain drug dealers of the Short North to exclude others from the territory, the object of which was to facilitate the drug sales of resident drug dealers, for the jury to find that a conspiracy to violate the drug laws existed under 21 U.S.C. § 846.
 
 
 19
 b. Individual Membership in Conspiracy
 
 
 20
 Two defendants, Needum and Anthony Gibbs, claim that there was insufficient evidence to show that they were members of the conspiracy. The other defendants adopt in their briefs by reference, under Federal Rule of Appellate Procedure 28(i), the arguments of these two. In order to adopt by reference the arguments of a co-defendant, "the arguments adopted must be readily transferable from the proponent's case to the adopter's case." United States v. Elder, 90 F.3d 1110, 1118 (6th Cir. 1996). Although, typically, an argument that a particular defendant did not join an alleged conspiracy is fact-specific and not readily transferable to a co-defendant, and Needum and Gibbs referred in their briefs to the lack of evidence with respect to their own involvement in the conspiracy, the crux of their argument is that the government has failed to introduce any evidence to show that they joined in the agreement to exclude non-resident drug dealers from selling in the Short North. We conclude that such an argument is readily transferable to all defendants. Since the government was thoroughly aware that each of the defendants strongly disputed the existence of the conspiracy, we conclude that the government should have responded at oral argument or in its brief with respect to all of the defendants.
 
 
 21
 "To be found guilty of conspiracy, the government must prove that [the defendant] was aware of the object of the conspiracy and that he voluntarily associated himself with it to further its objectives." United States v. Hodges, 935 F.2d 766, 772 (6th Cir. 1991). Once a conspiracy is shown, evidence connecting a particular defendant to the conspiracy "need only be slight." Avery, 128 F.3d at 971; United States v. Nesbitt, 90 F.3d 164, 167 (6th Cir. 1996); Hodges, 935 F.2d at 773. The defendant "need not be an active participant in every phase of the conspiracy, so long as he is a party to the general conspiratorial agreement." Hodges, 935 F.2d at 773 (quoting United States v. Christian, 786 F.2d 203, 211 (6th Cir. 1986)). A buyer/seller relationship alone is not enough to establish participation in the conspiracy,but further evidence indicating knowledge of and participation in the conspiracy can be enough to link the defendant to the conspiracy. See United States v. Anderson, 89 F.3d 1306, 1310 (6th Cir. 1996), cert. denied, 519 U.S. 1100 (1997).
 
 
 22
 The government argues that there is plenty of testimony that Needum and Anthony Gibbs frequently sold crack in the Short North area, thereby enabling the jury to find that both of them participated in the conspiracy. The fact that they engaged in drug activity in the Short North area, and according to the government that the SNP controlled crack sales in the Short North, does not show that these particular defendants were members of the conspiracy. See Richardson, 130 F.3d at 775 (concluding that the government would have a weak theory if its argument was "[the conspiracy] had a monopoly on drug sales in the [gang] territory; defendants sold drugs in the territory; therefore defendants... were members of the conspiracy"). The witness testimony at trial also does not support the Conclusion that evidence of membership in the SNP is sufficient to show that a particular defendant joined the conspiracy. Cooperating government witnesses testified that the SNP was primarily a neighborhood affiliation, and one witness testified that selling drugs was not a prerequisite to association with this loose group. See J.A. at 1018-19 (Test. of Berger).
 
 
 23
 Although only "slight" evidence is needed to connect a defendant to a conspiracy, "mere association with conspirators is not enough to establish participation in a conspiracy." United States v. Pearce, 912 F.2d 159, 162 (6th Cir. 1990) (quoting United States v. Stanley, 765 F.2d 1224, 1243 (5th Cir. 1985)), cert. denied, 498 U.S. 1093 (1991). "The distinction is especially important today when so many prosecutors seek to sweep within the drag-net of conspiracy all those who have been associated in any degree whatever with the main offenders." Bostic, 480 F.2d at 968.
 
 
 24
 The government must present sufficient evidence to permit the jury to find that the specific defendants were connected to the agreement, i.e., participated in the conspiracy, to exclude non-resident drug dealers from the Short North. The government need not prove that a particular defendant acted by force, intimidation, or otherwise to prevent a non-resident from dealing drugs in the Short North. Nor must the government prove that a particular defendant explicitly or outspokenly joined in the agreement to exclude non-residents from selling drugs in the Short North. The government must, however, point to evidence showing that a particular defendant had knowledge of the agreement to exclude non-resident drug dealers from the Short North and acquiesced in that agreement. The evidence must at least be sufficient that a reasonable juror could infer knowledge of and acquiescence in the agreement. Such an inference could be drawn from evidence showing at a minimum that a particular defendant was aware of a threat of unwanted competition from non-resident drug dealers and indicated that he had a stake in preventing such competition. Without this or similar evidence of knowledge and acquiescence in the type of agreement the government has alleged as the basis of this conspiracy, no reasonable juror could find that a particular defendant joined the conspiracy that existed here.
 
 
 25
 Evaluating the record independently for evidence of knowledge and acquiescence by any or all of the defendants in the agreement to exclude non-resident drug dealers from selling in the Short North, we conclude that the government's evidence proves only that Antwan Woods was a member of the conspiracy. In addition to Antwan Woods being an active supplier of crack to a number of individuals in the Short North, having a tattoo indicating his affiliation with the Short North Posse, having a notebook of accountswith SNP written on it, and possessing T-shirts with SNP-related information, there was also direct information indicating Woods's understanding of and involvement in the agreement to exclude non-resident drug dealers from the Short North. Government witness Gladden testified that he heard from Woods on occasion that certain people could not sell in the Short North. See Trial Tr. at 1491 (Test. of Gladden). Although this evidence is spare, and there is no evidence that Woods ever acted to force any unwelcome dealers out of the Short North, taking the evidence in a light most favorable to the government, we hold that a reasonable juror could infer that Woods had knowledge of the agreement and acquiesced in it. As we explained above, under 21 U.S.C. § 846 the government need not prove that Woods acted in furtherance of the agreement.
 
 
 26
 With respect to the other six defendants, the government's evidence proved simply that these defendants independently sold a lot of drugs. Some bought from each other. Others, though acting independently, associated with each other. Nowhere do we see evidence that any specific defendant agreed to participate in the conspiracy to exclude outsiders so as to further the drug sales of insiders.
 
 
 27
 Due to the fact that the record in this case is so large, the government may file a petition for rehearing identifying any record citations to existing trial testimony that our review has not unearthed that would link a particular defendant to the conspiracy to exclude outsiders in furtherance of insiders' drug sales. We stress, however, that evidence that a particular defendant was a member of the Short North Posse is not sufficient to show that the defendant joined this conspiracy to exclude outside drug dealers. As explained above, it is clear from the record only that the SNP was a loose neighborhood affiliation of youths, a number of whom sold drugs. One of the common interests of the SNP members was, no doubt, protection of their territory. But the evidence does not support the Conclusion that the SNP and the conspiracy proven in this case were synonymous with one another. Evidence that a particular defendant sold crack in the Short North is insufficient to prove membership in the conspiracy. There is copious evidence to support the Conclusion that each one of these defendants sold crack at one time or another in the Short North. If this were enough to show that a particular defendant joined the conspiracy, however, a jury could convict on conspiracy grounds any Short North resident who had been caught or seen selling crack in the Short North without any evidence of knowledge of the agreement to exclude outsiders. Finally, evidence that the defendants knew each other, grew up together, sold crack in the same area, or on occasion sold crack together fails to prove membership in the conspiracy. Any other Conclusion would permit the jury to infer membership in the conspiracy by association of the defendants with one another. We must be careful, especially in multi-defendant drug conspiracy trials, to guard against such findings of guilt by association. "The need for safeguarding defendants from misunderstanding by the jury is peculiarly acute in conspiracy trials." United States v. Liss, 137 F.2d 995, 1003 (2d Cir.) (Frank, J., Dissenting), cert. denied, 320 U.S. 773 (1943). Of course, should the government file such a petition with record citations, then the defendants would have an opportunity to respond.
 
 
 28
 We therefore affirm Woods's conspiracy conviction and vacate the conspiracy conviction of each of the other six defendants. We further vacate the sentences of Anthony Gibbs, Hough, Berry, Chad Gibbs, Curtis, and Needum, and remand for resentencing.
 
 3. Drug Counts
 
 29
 Four of the defendants, Hough, Chad Gibbs, Needum, and Woods, challenge the sufficiency of the evidence withrespect to their 21 U.S.C. § 841(a) convictions. The elements of a violation of § 841(a) "are (1) the defendant knowingly; (2) possessed a controlled substance; (3) with intent to distribute." United States v. Jackson, 55 F.3d 1219, 1225 (6th Cir.), cert. denied, 516 U.S. 926 (1995).
 
 
 30
 Hough challenges his conviction on Count 81, which charged him with possession with intent to distribute more than fifty grams of crack in March 1994. One witness testified to seeing Hough with four bags of crack cocaine in March 1994. See J.A. at 1286-88, 1291, 1296-97. The witness, Thomas Terry, was a cooperating government witness. No other evidence was presented. "Attacks on witness credibility are simple challenges to the quality of the government's evidence and not the sufficiency of the evidence." Sanchez, 928 F.2d at 1457 (quoting United States v. Adamo, 742 F.2d 927, 932 (6th Cir. 1984)). Although testimony from one eyewitness is spare, the quality of the evidence is a factual matter for the jury to evaluate. Hough's challenge to the sufficiency of this evidence therefore fails.
 
 
 31
 Chad Gibbs argues that the evidence was insufficient to support his conviction on Count 46, which charged him with possession with intent to distribute more than five grams of crack. Again only one witness testified to directly seeing Gibbs sell crack cocaine. See J.A. at 755-57, 773-75 (Test. of Andrew Jackson). Other witnesses partially corroborated this testimony. See J.A. at 501-03, 578 (Test. of Dotson); 912-13, 916-17 (Test. of Gladden); 1065-70 (Test. of Miller); 1281 (Test. of Terry). Gibbs argues that Jackson's testimony is unreliable, but again, as indicated above, this is not a sufficiency of the evidence argument.
 
 
 32
 Needum challenges his conviction on Count 102. This conviction was for a baggie of crack found in the living room of Robert Curtis's apartment during the execution of a search warrant in May 1994. One government witness testified that Needum lived across the street from Curtis's apartment and frequented it. See J.A. at 1125-26 (Test. of Officer Corbin). But this witness also testified that a number of individuals frequented this apartment. The government cites testimony showing that Needum had unlimited access to Curtis's apartment, see Trial Tr. at 1420 (Test. of Gladden), that Needum entered Curtis's apartment on May 10, 1994, to obtain a pistol that he used to rob Agent Russell, that the pistol was found during the execution of the search warrant, see J.A. at 1733-36, 1844 (Test. of Russell), and that Needum left Curtis's apartment minutes before the search warrant was executed. See J.A. at 1128-31, 1135-37 (Test. of Corbin); 1449-50 (Test. of D'Alesio); 1833-34 (Test. of Russell). Furthermore, Curtis and Needum frequently sold crack in the court outside of Curtis's apartment. See J.A. at 509-10, 579-80, 583-84 (Test. of Dotson); 649-54, 695-96 (Test. of Clausell).
 
 
 33
 The government argues that this evidence is sufficient to show that Needum had constructive possession over the baggie of crack found during the search warrant. "Constructive possession requires that a person knowingly have power and intention to exercise control over an object." United States v. Critton, 43 F.3d 1089, 1096 (6th Cir.), cert. denied, 514 U.S. 1121 (1995). See also United States v. Kincaide, 145 F.3d 771, 782 (6th Cir. 1998). Constructive possession may be proved by circumstantial evidence. See United States v. Craven, 478 F.2d 1329, 1333 (6th Cir.), cert. denied, 414 U.S. 866 (1973). The government does not offer any evidence that Curtis and Needum owned or possessed narcotics collectively or that Needum had ever entered Curtis's apartment to obtain crack. There is also no evidence that Needum had any intent to exercise control over this particular bag of crack. Unlimited access to a particular area, however, is sometimesenough. Cf. Kincaide, 145 F.3d at 782 (holding that "[p]roof that `the person has dominion over the premises where the firearm is located' is sufficient to establish constructive possession" (citation omitted)). The fact that Needum frequently sold crack with Curtis outside the apartment and on one occasion entered the apartment to obtain a weapon to use in a robbery, coupled with the fact that the baggie of crack was in plain sight in the living room and Needum had been in the apartment minutes before, is enough for the jury reasonably to conclude that Needum had constructive possession over this baggie of crack.
 
 
 34
 The government reads Curtis's brief to challenge his conviction on Count 102 as well. While we do not find such a claim in Curtis's brief, we note that there is clearly sufficient evidence for a reasonable jury to conclude that Curtis had constructive possession of the baggie of crack found in his apartment during the police search.
 
 
 35
 Needum also challenges his conviction on Count 47, which, like Chad Gibbs's conviction above, rests solely on Andrew Jackson's testimony. See J.A. at 776-78, 848-49 (Test. of Jackson). The government cites a number of witnesses who corroborate Jackson's testimony. As indicated above, credibility of witnesses goes to the weight of the evidence, not the sufficiency.
 
 
 36
 Finally, Woods challenges his conviction on Count 146 for possession with intent to distribute crack. Count 146 was for 28.6 grams of crack found in a green handbag in the pink bedroom of Woods's house during the execution of a valid search warrant. Woods argued that he lived in the black bedroom. Two other people, Woods's mother and Sean Dardin, lived in the house. Witnesses testified that Dardin was also a crack dealer. See J.A. at 619-20 (Test. of Dotson); 963-64 (Test. of Gladden). Woods argues that because Dardin was a crack dealer and was upstairs during the search near the pink bedroom, while Woods was downstairs during the search where no drugs were found, there is insufficient evidence to find that he was in constructive possession of the crack in the pink bedroom. Woods cites United States v. Peters, 15 F.3d 540, 544 (6th Cir. 1994), for support. There, however, the police failed to show that the defendant had sold cocaine out of the duplex in question before, or that she had any association with the sole occupant of the upstairs room where the drugs were found. Here, under Woods's theory, both Woods and Dardin could argue that they were not the occupants of the pink bedroom, that the drugs belonged to the other, and therefore insufficient evidence exists to convict either. As made clear above, circumstantial evidence is sufficient to convict a person of constructive possession. Moreover, exclusive possession is not required. See Craven, 478 F.2d at 1333. Finally, Agent Russell testified that he saw Woods carrying a green handbag that matched the handbag police found at Woods's residence. See J.A. at 1764, 1766-67 (Tr. at 3083, 3085-86). We conclude that there was sufficient evidence to convict Woods of constructive possession of this crack.
 
 4. Firearm Convictions
 
 37
 Five of the defendants, Hough, Needum, Curtis, Anthony Gibbs, and Antwan Woods, challenge the sufficiency of the evidence for their convictions for using or carrying a firearm during and in relation to a drug trafficking crime under 18 U.S.C. § 924(c)(1) in light of Bailey v. United States, 516 U.S. 137 (1995), which was decided subsequent to their convictions. In Bailey, the Supreme Court held that "use" under § 924(c)(1) requires active employment of the firearm, which "includes brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm." Id. at 148.
 
 
 38
 In order to reverse on a sufficiency of the evidence claim after Bailey,this court, in addition to considering the "use" prong of § 924(c)(1), may also consider whether under the "carry" prong of § 924(c)(1) a reasonable juror would have to conclude that the firearm was carried during and in relation to the predicate offense. See United States v. Washington, 127 F.3d 510, 515 (6th Cir. 1997), cert. denied, - -- U.S. ---, 118 S. Ct. 2348 (1998); United States v. Taylor, 102 F.3d 767, 769 (6th Cir. 1996), cert. denied, 524 U.S. 125, 118 S. Ct. 327 (1997). A defendant carries a firearm when he conveys or moves the firearm, including via a vehicle, and when there is "personal agency and some degree of possession" over the firearm. See Muscarello v. United States, 524 U.S. 125, 118 S. Ct. 1911, 1917 (1998) (holding that "carry" includes driving a car with guns locked in the glove compartment or the trunk). Finally, there must be sufficient evidence that the defendant was using or carrying the firearm "during and in relation to any... drug trafficking crime." 18 U.S.C. § 924(c)(1).
 
 
 39
 Hough argues that the evidence was insufficient to convict him under § 924(c)(1) in Count 82. Government witness Thomas Terry testified that he saw Hough in March 1994 with a.38 caliber pistol tucked in his pants while he was holding bags of crack. See J.A. at 1286-88, 1291, 1296-97 (Test. of Terry). Because the firearm was tucked in Hough's pants, the jury would have to have found that Hough was carrying it under § 924(c)(1). The jury could also reasonably find that the presence of the firearm was "during and in relation to" the selling of the crack. We hold therefore that the Bailey decision has no effect on Hough's conviction.
 
 
 40
 Needum contends that the evidence was insufficient with respect to Count 97, on which he was convicted of a § 924(c)(1) violation for using a firearm to rob Agent Russell of $420 after selling him crack on May 10, 1994. Although Needum used the firearm to rob Agent Russell, he did not use the firearm during and in relation to the sale of crack. Russell returned to his car after buying crack from Needum, but Needum summoned him back. Needum then sold Russell a few more pieces of crack. Needum called Russell back a second time, however, offering to find him more crack. This time, Needum entered Curtis's apartment, retrieved the gun, and then returned and robbed Russell. See J.A. at 1731-34.
 
 
 41
 To be during and in relation to the drug trafficking crime, "the Government must prove that the firearm furthered the purpose or effect of the crime and that its presence or involvement was not the result of coincidence." United States v. Riascos-Suarez, 73 F.3d 616, 623 (6th Cir.) (citing Smith v. United States, 508 U.S. 223 (1993)), cert. denied, 519 U.S. 848 (1996). The government contends that enticing Russell to return to buy more drugs is enough to make the use of the firearm for robbery a use during and in relation to the drug sale. We disagree. Attracting a person with the allure of a drug sale and then robbing the person is not enough to qualify as use of a firearm in relation to a drug sale. Here, despite the temporal proximity of the drug sale to the robbery, the firearm was used in relation to the latter, not the former. Section 924(c)(1) also applies to the use of a firearm in relation to "a crime of violence," but the government did not charge Needum with robbery here. There is no evidence that Needum actively employed a firearm in relation to the sale of crack to Agent Russell on May 10, 1994. We therefore reverse Needum's § 924(c)(1) conviction on Count 97. On remand the government may seek an enhancement for constructive possession of the firearm in relation to the sale of crack to Russell under U.S. Sentencing Guidelines Manual (U.S.S.G.) § 2D1.1(b) (1995). See Welch, 97 F.3d at 150.
 
 
 42
 Curtis and Needum both contest their § 924(c)(1) convictions on Count 103. This Count was based on the presence of a loaded pistol found on the top shelf of a group of shelves in Curtis's apartment during the execution of the aforementioned search warrant. A baggie of crack cocaine was found on the bottom shelf of the same group of shelves. The government argues that both Curtis and Needum had constructive possession of the firearm, under the same theory that they had constructive possession of the crack. While constructive possession may support a sentence enhancement under U.S.S.G. § 2D1.1(b), it is not alone sufficient to qualify as using or carrying the firearm for purposes of § 924(c)(1). The government argues that the presence of the firearm in plain view qualifies as a "display" of the firearm under Bailey. The display, however, must be during a drug transaction. See Bailey, 516 U.S. at 146. There was no evidence that a transaction was taking place when the search warrant was executed. There was also no evidence that Curtis or Needum sold drugs in Curtis's apartment that would permit the jury to infer circumstantially that the firearm was displayed or otherwise used during and in relation to a drug trafficking crime. We therefore reverse Needum's and Curtis's § 924(c)(1) convictions on Count 103, but again on remand the government may seek enhancement of their sentences for constructive possession of the firearm under U.S.S.G. § 2D1.1(b).
 
 
 43
 Anthony Gibbs contends that there was insufficient evidence to convict him under § 924(c)(1) in Count 133. The government indicates that Counts 132 and 133 relate to a drug transaction Gibbs had with Robert Phillips. After selling crack to Phillips, Gibbs robbed him of his money. See J.A. at 1115-17 (Test. of Phillips). Although Phillips could not identify Gibbs, police officer John Corbin arrived at the scene during the robbery and identified Gibbs. See J.A. at 1168-71 (Test. of Corbin). Based on this testimony, which the jury found adequate to convict, a reasonable juror would have to conclude that Gibbs carried the firearm during the drug transaction, because moments later he used the gun to rob Phillips. The men were in Phillips's car, so Gibbs must have had the firearm on his body during the drug sale.
 
 
 44
 Finally, Woods challenges his § 924(c)(1) conviction on Count 147, which was based on the guns found in his house during the execution of the search warrant on September 2, 1994. The government concedes that this conviction was based on the fortress theory of § 924(c)(1) that did not survive the Supreme Court's narrowing in Bailey of the term "use," and that the conviction should therefore be reversed. We reverse Woods's conviction and remand for the district court to assess the possibility of sentence enhancement under U.S.S.G. § 2D1.1(b).
 
 B. Bailey Jury Instruction
 
 45
 The jury requested during deliberations "a definition of used and carried a firearm." J.A. at 1966 (Bench Conference). The district court gave the jury an instruction of "use" that read, in part, "the firearm was in the defendant's possession or under the defendant's control at the time that a drug trafficking crime was committed." J.A. at 1965 (Bench Conference). The defendants claim that their firearms convictions should be reversed because this jury instruction was in error in light of Bailey. Because the instruction would allow a jury to find that the defendant used the firearm without any active employment, the instruction was clearly erroneous in light of the subsequent decision in Bailey, which the government concedes.
 
 
 46
 This court has issued a number of opinions dealing with jury instructions that were rendered erroneous by Bailey. See United States v. Allen, 106 F.3d 695, 701 (6th Cir.), cert. denied, 520 U.S. 1281 (1997); United States v. Anderson, 89 F.3d 1306 (6th Cir. 1996); United States v. Moore, 76 F.3d 111(6th Cir. 1996); Taylor, 102 F.3d at 769-71. In both Anderson and Taylor, this court applied plain error analysis because the defendants failed to object to the jury instructions, even though at the time the instructions were given this court had accepted the fortress theory of § 924(c)(1) liability. The other two cases focused simply on the question of whether it was possible that the jury instruction led the jury to base the conviction on impermissible grounds, without specifically stating the level of review. Here, Hough and Curtis did object to the jury instructions at trial, and their convictions should be reviewed under a harmless error analysis. The other defendants did not independently object, but the district court had previously agreed to accept an objection by one of the defendants as an objection by all.
 
 
 47
 We analyze whether the erroneous jury instruction prejudiced each of the defendants. Under harmless error analysis, reversal is warranted only if the instruction affected a substantial right of the defendants. See Fed. R. Crim. P. 52(a). Hough and Anthony Gibbs were both indicted for carrying firearms on their persons during crack cocaine transactions. The erroneous jury instruction defining "use" could not have affected their convictions because no properly instructed reasonable juror could have found that the defendants did not carry the firearms.
 
 
 48
 Had we not reversed for insufficiency of the evidence Needum's conviction on Count 97, which relates to his robbery of Agent Russell after retrieving a pistol from Curtis's apartment, we would have to reverse Needum's Count 97 conviction on this ground. Even if a jury could find that robbing a person with a gun obtained after the drug transaction was completed could still be during and in relation to a drug trafficking crime, the erroneous instruction allowed the jury to base its conviction on the theory that Needum constructively possessed the firearm while he engaged in the drug sale with Russell. Needum was therefore prejudiced by this jury instruction.
 
 
 49
 Had we not reversed Needum's and Curtis's convictions on Count 103, regarding the gun found on the same set of shelving as the baggie of crack in Curtis's apartment, we would have to reverse the Count 103 convictions on this ground. Again, the jury could have based its conviction on constructive possession of the firearm rather than on the government's theory that they actively displayed the firearm during and in relation to an underlying drug trafficking offense. Needum and Curtis were therefore prejudiced by this instruction.
 
 
 50
 Finally, Woods's conviction on Count 147, which the government concedes should be reversed for insufficient evidence, would also have to be reversed on this ground. Again, the jury instruction impermissibly allowed the jury to convict based on the now-defunct fortress theory of § 924(c)(1) liability.
 
 
 51
 Therefore we uphold the § 924(c)(1) convictions of Hough on Count 82 and Anthony Gibbs on Count 133. We reverse the § 924(c)(1) convictions of Needum on Counts 97 and 103, Curtis on Count 103, and Woods on Count 147.
 
 C. Variance
 
 52
 Anthony Gibbs argues that there was a variance between the government's conspiracy indictment and the evidence actually presented at trial. His contention is that the government alleged the existence of a street gang in the indictment, which the evidence at trial did not prove. Obtaining a reversal of a conviction because of a variance between the indictment and the evidence requires satisfaction of a two-prong test: "(1) the variance itself must be demonstrated; and (2) the variance must affect some substantial right of the defendant." United States v. Kelley, 849 F.2d 999, 1002 (6th Cir.), cert. denied, 488 U.S. 982 (1988). "A variance occurs when the evidence offered at trial differsmaterially from the charge in the indictment." United States v. Martinez, 981 F.2d 867, 872 (6th Cir. 1992), cert. denied sub nom. Escamilla v. United States, 507 U.S. 1041 (1993).
 
 
 53
 Whether, based on the evidence presented at trial, a conspiracy has been proven is a question of fact for the jury. The indictment states that the basis for the conspiracy charge was the defendants' agreement to exclude persons who were not affiliated with or members of the Short North Posse from selling drugs in the Short North. The government's opening statement is vague as to the specific theory of the drug conspiracy, but it does argue that a number of drug dealers from the Short North were part of a tacit agreement to exclude non-resident drug dealers from selling in the Short North. As we held above, the evidence at trial was sufficient to prove the conspiracy alleged in the government's indictment. The crux of the defendants' argument is really the question of whether the government presented sufficient evidence to establish different defendants' membership in the conspiracy. This issue was addressed above.
 
 
 54
 Furthermore, to the extent the defendants are arguing that the government presented evidence of multiple conspiracies, the jury instructions reduced the chance that any substantial rights were affected. Here, the district court specifically instructed the jury that "the government must convince you beyond a reasonable doubt that the defendant was a member of the conspiracy charged in the indictment. If the government fails to prove this, then you must find that defendant not guilty of the conspiracy charged, even if you find that he was a member of some other conspiracy." J.A. at 1945-46 (Jury Charge). We hold that these instructions provided sufficient safeguards to ensure that the jury's conviction was based on the conspiracy charged in the indictment.
 
 D. Admission of Photographs
 
 55
 Defendants Woods and Chad Gibbs object to the district court's decision to allow the introduction into evidence of a number of photographs of gang-related imagery. The first group consists of photographs of two T-shirts found in Woods's bedroom during the execution of the search warrant for his house. The second consists of photographs of graffiti-covered buildings in the Short North area. The graffiti included references to the SNP. The defendants argue that these photographs were more unfairly prejudicial than probative under Federal Rule of Evidence 403.
 
 
 56
 Federal Rule of Evidence 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We review a district court's Rule 403 ruling for abuse of discretion. See United States v. Sassanelli, 118 F.3d 495, 498 (6th Cir. 1997); United States v. Bonds, 12 F.3d 540, 567 (6th Cir. 1993). "Under such a standard of review, this court takes a maximal view of the probative effect of the evidence and a minimal view of its unfairly prejudicial effect, and will hold that the district court erred only if the latter outweighs the former." Sassanelli, 118 F.3d at 498. See also Bonds, 12 F.3d at 567. As the Supreme Court has stated,
 
 
 57
 "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules. Assessing the probative value of common membership in any particular group, and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 and ultimately, if the evidence is admitted, for the trier of fact."United States v. Abel, 469 U.S. 45, 54 (1984). "Unfair prejudice `does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest decision on an improper basis.'" Bonds, 12 F.3d at 567 (quoting United States v. Schrock, 855 F.2d 327, 333 (6th Cir. 1988) (citation omitted)).
 
 
 58
 Both of the T-shirts found in Woods's bedroom contained references to the "Short North" and the "4th Street Posse." Woods claims the admission of the T-shirts was unfairly prejudicial to his trial because one shirt also included the language "Death Row" and "Caps get peel'd" and the other contained a drawing of a tombstone and references to shootings. Although the violent nature of some of the language of the T-shirts might be prejudicial, we do not believe it constituted unfair prejudice, and Woods's possession of the T-shirts was highly probative of the government's claim that he was a member of the SNP. "Gang affiliation is particularly relevant, and has been held admissible, in cases where the interrelationship between people is a central issue." United States v. Thomas, 86 F.3d 647, 652 (7th Cir.), cert. denied sub nom. Story v. United States, --- U.S. ---, 117 S. Ct. 392 (1996). See also United States v. Robinson, 978 F.2d 1554, 1563-64 (10th Cir. 1992) (connecting information that a defendant was a member of a gang to evidence that the gang's sole purpose was drug trafficking), cert. denied, 507 U.S. 1034 (1993). Although we concluded above that the SNP and the conspiracy were not one and the same, the government's initial theory was that all drug dealers who were members of the SNP were in the conspiracy, and the T-shirts were direct evidence that Woods was a member of the SNP. We hold that the probative nature of this evidence outweighs the danger of any unfairly prejudicial effects.
 
 
 59
 We think the photographs of the graffiti-covered buildings in the Short North were more unfairly prejudicial than probative of any material fact. Although the buildings were painted with SNP graffiti, they also had writings such as "cop killer," "slob killer," and "Crips." The government claims that this evidence "was directly relevant to the factual issue of whether a conspiracy to distribute drugs in the Short North existed." Br. of Appellee at 71-72. We do not agree. Not one witness at trial disputed the fact that the SNP existed, which is the only fact that the graffiti could support. Nothing about the graffiti provided direct or even circumstantial evidence that the SNP was a conspiracy to facilitate drug sales. The government also presented no evidence that linked any of the defendants to the particular graffiti in the photographs. Moreover, the jury could have improperly attributed the violent references in the graffiti to the defendants, without any evidence that one of them painted those messages. Because the photographs were probative only of a single undisputed fact, that the SNP existed, and contained a number of potentially unfairly prejudicial messages, we hold that the district court abused its discretion by admitting them into evidence over the objection of Chad Gibbs.
 
 
 60
 In order to obtain reversal of any of the convictions on this basis, however, these photographs must survive a harmless error analysis under Federal Rule of Criminal Procedure 52(a). Unlike the Rule 403 analysis that considers the unfairly prejudicial effect of the particular piece of evidence at issue, harmless error analysis requires this court to consider whether the particular evidence prejudiced the outcome of the trial and resultant convictions. We hold that the photographs of graffiti on buildings that happened to include references to the SNP were unlikely to have had any substantial effect on the defendants' convictions.
 
 E. Dismissal of Defense Witnesses
 
 61
 Woods and Chad Gibbs each argue that the district court improperly excused two defense witnesses from testifying. Each witness invoked through counsel his Fifth Amendment privilege against self-incrimination. Woods attempted to call Curtis West as a defense witness with respect to Count 125, which related to a sale of crack Woods made to Agent Russell on July 15, 1994. The district court excluded West from testifying after his attorney told the court that West would invoke his Fifth Amendment privilege. See J.A. at 1913-14 (Bench Conference). Chad Gibbs argues that he sought to call West and Karlos Davis as defense witnesses. The district court excused Davis after Davis's attorney confirmed that Davis would invoke his privilege against self-incrimination with respect to all questions. See J.A. at 1894-1902 (Bench Conference). There is some evidence in the record that Gibbs was going to call West to testify, see J.A. at 1913-14, but no evidence that he sought to call Davis. Both West and Davis had previously pleaded guilty in federal court to drug trafficking crimes.
 
 
 62
 "A defendant's right to force a witness to testify must yield to that witness' assertion of his Fifth Amendment privilege against self incrimination, where it is `grounded on a reasonable fear of danger of prosecution.'" United States v. Gaitan-Acevedo, 148 F.3d 577, 588 (6th Cir.) (quoting United States v. Damiano, 579 F.2d 1001, 1003 (6th Cir. 1978)), cert. denied sub nom. Crehore v. United States, --- U.S. ---, 119 S. Ct. 256 (1998). The trial Judge has broad discretion to determine whether or not the claim to the privilege has merit. Id. However, "the law of this circuit requires the subpoenaed witness `to take the witness stand and assert the [Fifth Amendment] privilege in response to particular questions.'" United States v. Mahar, 801 F.2d 1477, 1495 (6th Cir. 1986) (brackets in original) (quoting United States v. Stephens, 492 F.2d 1367, 1374 (6th Cir.), cert. denied, 419 U.S. 852 (1974)). A witness cannot meet the reasonable-fear-of-prosecution prong by simply making a blanket assertion of the privilege against self-incrimination. Id. However, in certain circumstances, when it is clear that the witness intends to invoke the privilege with respect to any question asked, "a particularized inquiry by the court would [be] futile." United States v. Medina, 992 F.2d 573, 587 (6th Cir. 1993), cert. denied, 510 U.S. 1109 (1994).
 
 
 63
 Here the district Judge properly found that each witness had a reasonable fear of prosecution in state court or in federal court for federal crimes not encompassed by their plea agreements. Under Ohio law, state prosecution following federal prosecution is not barred by double jeopardy. See State v. Fletcher, 271 N.E.2d 567 (Ohio 1971), cert. denied sub nom. Walker v. Ohio, 404 U.S. 1024 (1972). It is beyond dispute, however, that the district Judge committed error when he permitted the witnesses to claim their Fifth Amendment privileges without taking the stand, regardless of whether permitting the witnesses to assert a blanket privilege would have been acceptable once they took the stand. The district court therefore committed error.
 
 
 64
 Woods's attorney made a proffer of the evidence that West would offer in favor of Woods's case. See J.A. at 1897-98, 1915. We hold that this proffer brought the issue of the scope of West's Fifth Amendment privilege to the attention of the district court and therefore review the district court's error with respect to Woods under the harmless error standard. See Fed. R. Crim. P. 52(a). Woods proffered that West would testify that Woods was not the source of the crack that formed the basis of Woods's 21 U.S.C. &#167 841conviction on Count 125 of the indictment. See J.A. at 1915.
 
 
 65
 Not only is it likely that West would have invoked his Fifth Amendment privilege with respect to knowledge of any specific drug transactions, but we note that the government also referred to specific evidence it had obtained directly from Woods that would rebut the proffered hypothetical testimony. See J.A. at 1915-16. We cannot conclude that any evidence that might have been admitted would have had an effect on Woods's conviction. We therefore hold that the district court's error was harmless.
 
 
 66
 Although Chad Gibbs argues that he sought to call both Davis and West as defense witnesses, he did not object to the district court's decision to excuse West and Davis from testifying and did not offer to proffer testimony with respect to either. We therefore review the district court's error with respect to Chad Gibbs under the plain error standard. See Fed. R. Crim. P. 52(b). Gibbs does not state what exculpatory evidence, if any, these potential witnesses would have offered to which they would not have claimed their Fifth Amendment privilege, or to which they would not have had a Fifth Amendment privilege. The burden is on the defendant to show prejudice under the plain error test. See United States v. Olano, 507 U.S. 725, 735 (1993). Gibbs has not done so.
 
 F. Requested Jury Instructions
 
 67
 Defendant Chad Gibbs argues that the district court committed reversible error by failing to include certain requested jury instructions of various defendants in the charge to the jury. "We review jury instructions as a whole to determine whether they fairly and adequately submitted the issues and applicable law to the jury." United States v. Williams, 952 F.2d 1504, 1512 (6th Cir. 1991). "A... refusal to deliver the requested instruction is reversible only if that instruction is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense." Id. See also United States v. Monus, 128 F.3d 376, 389-90 (6th Cir. 1997), cert. denied, --- U.S. ---, 119 S. Ct. 67 (1998); United States v. Frost, 125 F.3d 346, 372 (6th Cir. 1997), cert. denied, --- U.S. ---, 119 S. Ct. 40 (1998).
 
 
 68
 Gibbs's claims are without merit. He argues first that the district court improperly charged the jury with respect to the conspiracy charged and the issue of multiple conspiracies. The district Judge gave detailed instructions on the issue of multiple conspiracies. See J.A. at 1945-47 (Tr. at 3966-68). The instructions included the language: "the government must convince you beyond a reasonable doubt that the defendant was a member of the conspiracy charged in the indictment." J.A. at 1945. Furthermore, the district court told the jurors that "the government must convince you that each of the members agreed to participate in what he knew was a group activity directed toward a common goal." J.A. at 1946. Gibbs fails to show how the proposed instructions were not substantially covered by the district court's instructions. Gibbs also fails to explain how the district court's answer to the jury's question regarding the conspiracy instructionsdid not satisfy the Williams test. See J.A. at 1978-94.
 
 
 69
 Gibbs argues next that the district court erred when it refused to include two proposed instructions that named specific witnesses and explained why their testimony should be given less weight than other witnesses' testimony. Without these, argues Gibbs, the district court failed to caution the jury with respect to cooperating government witnesses. We disagree. The district court instructed the jury:
 
 
 70
 "You have heard that the government has promised certain witnesses that they will not be prosecuted for further narcotics or narcotics-related weapon offenses in exchange for their testimony against the defendants.
 
 
 71
 "It is permissible for the government to make such a promise. But you should consider testimony pursuant to a plea agreement or grant of reduced criminal liability with more caution than the testimony of other witnesses. Consider whether the testimony may have been influenced by the government's promise.
 
 
 72
 "Do not convict the defendant based on the unsupported testimony of such a witness, standing alone, unless you believe his testimony beyond a reasonable doubt."
 
 
 73
 J.A. at 1956 (Tr. at 3985). These instructions are adequate; the district court does not need to provide cautionary instructions that specifically name witnesses.
 
 
 74
 Gibbs's final argument with respect to jury instructions is that the district court failed to ensure Gibbs a fair trial when it denied defendant Berry's jury instruction on intent. See J.A. at 274, 276-79 (Donneto Berry Req. for Specific Jury Instructions). Berry's instructions would have instructed the jury that 21 U.S.C. § 841(a)(1) is a specific intent crime. The district court instructed the jury that:
 
 
 75
 "For you to find the defendant guilty of this crime, you must be convinced that the government has proved each and every one of the following elements beyond a reasonable doubt:
 
 
 76
 "(1) First, that the defendant knowingly and intentionally distributed more than five grams of the controlled substance described in the indictment on or about the time alleged.
 
 
 77
 "(2) Second, at the time of such distribution, the defendant knew that this substance was cocaine base."
 
 
 78
 J.A. at 1951-52 (Tr. at 3977-78).
 
 
 79
 In a specific intent crime, "[t]he defendant must... act with the purpose of violating the law." United States v. Gonyea, 140 F.3d 649, 653 (6th Cir. 1998). In a general intent crime, the defendant need only "intend to do the act that the law proscribes." Id. (quoting United States v. Phillips, 19 F.3d 1565, 1576-77 (11th Cir. 1994)). "The `knowingly' and `intentionally' language in § 841(a) refers to the possessor's awareness that he is in possession of a controlled substance and not to his intention to distribute the substance sometime in the future. 21 U.S.C. § 841(a)(1) requires both general criminal intent and the specific `intent to distribute' before a violation is proven." United States v. Pope, 561 F.2d 663, 670 (6th Cir. 1977).
 
 
 80
 We view jury instructions in their entirety to determine if the law is conveyed properly. Id. It is clear from the instruction given to the jury that in order to convict, the jury must find that Gibbs knowingly possessed crack and intentionally distributed it. We hold therefore that there was no error in this instruction.
 
 G. Motion for Severance
 
 81
 Two defendants, Anthony Gibbs and Woods, argue that the defendants should have been severed and granted separate trials to avoid prejudice. The other defendants adopt this claim by reference. The district court refused to sever the trial. We review a district court's refusal to sever a trial for abuse of discretion. See Welch, 97 F.3d at 147; UnitedStates v. Elder, 90 F.3d 1110, 1118 (6th Cir. 1996), cert. denied, 519 U.S. 1131 (1997).
 
 
 82
 Under Federal Rule of Criminal Procedure 8(b), "[t]wo or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." However, if a defendant can show prejudice by joinder in the indictment and joinder for trial, the district court may, in its discretion, grant separate trials. See Fed. R. Crim. P. 14. Courts typically favor the joinder of defendants charged with participating in the same act or series of acts because it is more efficient than conducting separate trials. See Zafiro v. United States, 506 U.S. 534, 537 (1993). Courts presume that juries are capable of sorting out the facts relevant to each individual defendant's case. See Welch, 97 F.3d at 147. A defendant must show specific prejudice to his particular case to warrant a reversal for abuse of discretion. See id. at 148.
 
 
 83
 Here, none of the defendants can show prejudice. First, all of the defendants were charged in Count 1 of the indictment with conspiring to possess with the intent to distribute more than five grams of crack cocaine. This conspiracy was to be shown by the interrelationship of the alleged Short North drug dealers. Thus, a joint trial was appropriate under Rule 8(b). Only if a defendant can show prejudice to his case can we conclude that the district court abused its discretion by not granting severance under Rule 14.
 
 
 84
 The district court included a number of cautionary statements in its instructions to the jury to reduce the possibility of prejudice with respect to a joint trial. Cf. Zafiro, 506 U.S. at 540 (holding that sometimes the risk of prejudice can be allayed by proper cautionary instructions). For example, while explaining the general rules of deliberation, the district court noted that "[t]he presence or absence of other defendants or alleged co-conspirators at this trial is wholly irrelevant to your deliberations and should not be considered by you in determining whether you believe one or more defendants are guilty or innocent of the charges." J.A. at 1938 (Tr. at 3959). Additionally, in explaining the issue of multiple defendants charged with the same crime, the court stated:
 
 
 85
 "[I]n our system of Justice, guilt or innocence is personal and individual. It is your duty to separately consider the evidence against each defendant, and to return a separate verdict for each one of them. For each defendant, you must decide whether the government has presented evidence proving that particular defendant guilty beyond a reasonable doubt.
 
 
 86
 "Your decision on one defendant, whether he is guilty or not guilty, should not influence your decision on any of the other defendants."
 
 
 87
 J.A. at 1940 (Tr. at 3961).
 
 
 88
 None of the defendants has presented evidence to suggest that his conviction was in some way attributable to the fact of a joint trial. Woods argues that without the evidence of drug sales and robberies by the other defendants, he probably would not have been convicted. Not only do we think this unlikely, but "it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." Zafiro, 506 U.S. at 540. As explained above, the district court instructed the jury to consider each defendant individually, and Woods gives us no reason to fear that the jury did not or was unable to consider the specific evidence against him separately from the evidence presented against other defendants.
 
 
 89
 Gibbs argues more specifically that the robbery charges against him and Needum severely prejudiced the trial by introducing evidence of violent crimes that ran against the goals of the alleged conspiracy.Gibbs further argues that introduction of the robbery evidence created a variance from the indictment that was prejudicial. These claims are without merit. There was no variance, as Gibbs alleges, because each of the robberies at issue was listed as a separate Count in the indictment. There was also no prejudice to Gibbs because the government charged both Needum and Gibbs with gun counts during and in relation to drug trafficking crimes under 18 U.S.C. § 924(c), and therefore these charges are sufficiently related to the other transactions in the indictment to be tried together under Federal Rule of Criminal Procedure 8(b). Finally, we cannot conclude that the two robberies at gunpoint were so violent as to influence the jury to convict any of the defendants on an improper basis. Because no defendant can show prejudice with respect to his particular case, we hold that the district court did not abuse its discretion by denying the defendants' motion for severance.
 
 H. Peremptory Challenges
 
 90
 The defendants argue that the district court committed reversible error when it granted the defendants sixteen peremptory challenges and required that they exercise the challenges jointly. See J.A. at 385-86 (Tr. at 11-12). Under Rule 24(b) of the Federal Rules of Criminal Procedure, "the government is entitled to 6 peremptory challenges and the defendant or defendants jointly to 10 peremptory challenges." Moreover, "[i]f there is more than one defendant, the court may allow the defendants additional peremptory challenges and permit them to be exercised separately or jointly." Fed. R. Crim. P. 24(b). Accordingly, we review a district court's decisions regarding peremptory challenges, as long as they comply with the minimum requirements of Rule 24, for abuse of discretion. See United States v. Mosely, 810 F.2d 93, 96 (6th Cir.), cert. denied, 484 U.S. 841 (1987); United States v. Mayes, 512 F.2d 637, 644 (6th Cir.), cert. denied, 422 U.S. 1008 (1975).
 
 
 91
 The defendants argue that because they could not agree whether to challenge two particular jurors, the district court was obligated to either grant additional peremptory challenges or to authorize each defendant to exercise certain challenges independently of one another. Instead, the district court held a vote of the original eight defendants, which vote each time resulted in a four-four split, and then simply moved on. See J.A. at 455, 457 (Tr. at 302, 304). Two of these disputed jurors were eventually impaneled. See J.A. at 461 (Tr. at 308).
 
 
 92
 Although peremptory challenges are not a constitutional right, they have been held by the Supreme Court to constitute a "necessary part of trial by jury." Swain v. Alabama, 380 U.S. 202, 219 (1965). Denial of the right amounts to reversible error; there is no requirement of a showing of prejudice. See Mosely, 810 F.2d at 96 (citing Swain, 380 U.S. at 219). The defendants here have failed, however, to show a denial of their right to exercise peremptory challenges. Rule 24(b) requires that co-defendants be given a minimum of ten challenges to be exercised jointly or separately. Here the district court gave the defendants sixteen challenges and ordered that they be used jointly. "[T]he manner in which the peremptory challenges are exercised is a matter of local custom and traditionally has been left to the sound discretion of the district court." Mosely, 810 F.2d at 96.
 
 
 93
 Here the district court chose to conduct a majority vote when the defendants could not agree on particular jurors. When the vote resulted in deadlock, the district Judge simply moved on. This resulted in the impaneling of two jurors that four of the original eight defendants wished to strike. Although we think, with the benefit of hindsight, that it would have been better for the district Judge to have allocateda certain number of challenges to each defendant in light of the conflict that arose, none of the defendants explains how the district court's method prejudiced the trial or interfered with the right to an impartial jury. Although a defendant need not show prejudice when the district court interferes with a defendant's peremptory challenge right, when the district court satisfies the minimum requirements of Rule 24(b), we review for abuse of discretion. Although the defendants did not agree on all of the challenges, not one of the defendants explains how his case is sufficiently different in nature from his co-defendants' cases to render the district court's joint-challenge, majority-rule system an abuse of discretion under the circumstances.
 
 
 94
 I. Defendants' Absence During Voir Dire and Peremptory Challenges
 
 
 95
 Defendants next argue that the district court violated their constitutional rights by conducting part of the voir dire, and by holding a conference to exercise peremptory challenges, outside of the presence of the defendants. See Br. of Def. Curtis at 19-31 (other defendants adopting this argument by reference). The district court conducted part of the voir dire of the jury venire in the courtroom with all of the defendants present. Afterwards, ten prospective jurors were asked to remain due to the fact that they had responded in the affirmative when asked if they had heard or read any publicity about the case or apparently if they had any connection to illegal drugs. See J.A. at 391-92 (Tr. at 149-50). These jurors were then questioned one-by-one in a separate conference room while the others waited in the courtroom with the defendants. See J.A. at 392 (Tr. at 150). An attorney for one of the defendants objected to the absence of the defendants, but the district court overruled the objection, analogizing the situation to an extension of the sidebar conferences held with prospective jurors in the courtroom, which were held outside of the range of hearing of the defendants. See J.A. at 392-93 (Tr. at 150-51).
 
 
 96
 The district court also instructed counsel for defendants that the conference on peremptory challenges would be held in the jury room, and the defendants would not be present unless counsel insisted, but the attorneys could go out and discuss matters with their clients if they wished. See J.A. at 387-88 (Tr. at 13-14). None of the defendants' counsel objected to this statement by the district court, and none of the defendants' counsel objected to the defendants' absence during the peremptory challenges. See J.A. at 448-72 (Tr. at 295-320).
 
 
 97
 Defendants have a constitutional right to be present at all stages of their trial. This right "is rooted to a large extent in the Confrontation Clause of the Sixth Amendment, but [the Supreme Court has] recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him." United States v. Gagnon, 470 U.S. 522, 526 (1985) (citations omitted). The defendants' constitutional claim here is therefore properly brought under the Fifth Amendment, not the Sixth Amendment, because the challenged events occurred before any witnesses or evidence were brought against the defendants. Under the Fifth Amendment, a defendant "has a [constitutional] right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." Faretta v. California, 422 U.S. 806, 819 n.15 (1975).
 
 
 98
 Furthermore, Federal Rule of Criminal Procedure 43(a) mandates that "[t]he defendant shall be present... at every stage of the trial including the impaneling of the jury and the return of the verdict." Although stemming from the Constitution, this rule includes common-law rights and is broader than the protection provided in the Fifth and Sixth Amendments. SeeUnited States v. Brown, 571 F.2d 980, 986 (6th Cir. 1978). Rule 43(b) and (c) lists exceptions to the presence-of-the-defendant rule. The two incidents in this case do not fall within these exceptions. In fact, temporary exclusions of defendants during aspects of the impaneling of the jury have been held to constitute error. See Brown, 571 F.2d at 986 (holding that a conference discussing the dismissal of a juror outside of the presence of the defendant violated Rule 43(a), but was not a constitutional violation); United States v. Tipton, 90 F.3d 861, 872-73 (4th Cir. 1996) (recognizing the Rule 43 right to presence for all portions of the voir dire), cert. denied, 520 U.S. 1253 (1997); United States v. Alessandrello, 637 F.2d 131, 138 (3d Cir. 1980) (holding that absence of defendants from part of voir dire discussing trial publicity with prospective jurors was error under Rule 43), cert. denied, 451 U.S. 949 (1981).
 
 
 99
 Although under Rule 43(b), the right to presence can be waived, the government here does not argue waiver but concedes that the district court violated Rule 43(a). The government argues instead that the defendants fail to show prejudice under the harmless error test with respect to the voir dire conference and under the plain error test with respect to the peremptory challenges conference.
 
 
 100
 Defendants point out that the harmless error standard does not apply to impairments of the right to exercise peremptory challenges. See United States v. McFerron, 163 F.3d 952, 955-56 (6th Cir. 1998). We do not hold, however, that the defendants' right to exercise peremptory challenges was impaired. The issue of the defendants' absence during a portion of the exercise of peremptory challenges is a separate question. There is no dispute that the harmless error and plain error standards of Federal Rule of Criminal Procedure 52 apply to violations of Rule 43. See Tipton, 90 F.3d at 874-76 (applying plain error); United States v. Alikpo, 944 F.2d 206, 209-11 (5th Cir. 1991) (applying harmless error); Brown, 571 F.2d at 987 (applying harmless error). These courts refused to hold that the absence of the defendants from isolated portions of the impaneling of the jury rose to the level of a constitutional violation.
 
 
 101
 We therefore apply the harmless error and plain error tests of Federal Rule of Criminal Procedure 52 to the defendants' claims here. The harmless error test applies to the exclusion of the defendants from the portion of the voir dire when the district court questioned certain prospective jurors about publicity and illegal drugs, because Needum's attorney objected to the exclusion of the defendants from the conference room. See J.A. at 392-93 (Tr. at 150-51). No objection was registered with respect to the exercise of peremptory challenges in the jury room in the absence of the defendants, however, and we therefore review this issue for plain error.
 
 
 102
 Although the government concedes error under Rule 43(a) for both portions of the impaneling of the jury at issue, both the harmless error and plain error tests require reversal only if the defendants were prejudiced by the error. With respect to the voir dire, under the harmless error test, the government has the burden of showing that the defendants were not prejudiced by the error. See Olano, 507 U.S. at 735. Here, the defendants were excluded from only a small portion of the voir dire where a number of prospective jurors were interviewed, and in some cases, excused for cause based on their exposure to drug use or pretrial publicity. Furthermore, counsel for all the defendants were present, and the district court specifically informed them that they were free to confer with their clients at any time during this portion of the voir dire. Defendants' chief concern is that one prospective juror was exposed to antics of the defendants that occurred in the courtroom while she was waiting to be interviewed in the conferenceroom by the Judge and counsel. When asked about the incident, the prospective juror said she "just saw them talking" and she was "too far away from them to hear what they were talking about." J.A. at 419, 423 (Tr. at 177, 181). She then said "[t]hey were just talking and joking," J.A. 425 (Tr. at 183), and that this gave her the impression "[t]hat they were friends, that they knew each other." J.A. at 425 (Tr. at 183). The district court refused to dismiss her for cause. See J.A. at 425. Defendants' counsel later were unable to agree to a peremptory challenge of this prospective juror, see J.A. at 463-64, and she was eventually impaneled. See J.A. at 465.
 
 
 103
 The defendants' argument is essentially that they were prejudiced not because they were excluded from the voir dire conference, but because they were left in the courtroom with the prospective jurors waiting to be interviewed, and that the one prospective juror from this group who was eventually impaneled may have developed a bias against them. We reject this prejudice argument. The district court and counsel for defendants questioned the prospective juror about this incident, see J.A. at 419, 423-25, and the district court was satisfied that she could be impartial. See J.A. at 425 ("It would appear to me that she didn't pay any attention to that and was not affected by that and [is] someone who would make every effort to be fair and objective."). We have no reason to disagree with the district court's Conclusion. We conclude that the government has met its burden of showing that this error was harmless beyond a reasonable doubt.
 
 
 104
 The absence of the defendants from the peremptory challenge conference may sometimes constitute reversible error because courts have recognized that defendants can often be helpful in noticing or pointing out things about certain jurors that their lawyers might not or could not see. See United States v. Camacho, 955 F.2d 950, 953 (4th Cir. 1992); United States v. Gordon, 829 F.2d 119, 124 (D.C. Cir. 1987). This process is important to ensuring an impartial jury. However, under the plain error standard, the defendants must make a specific showing of prejudice to warrant reversal of a conviction. See Olano, 507 U.S. at 735. Here, although the defendants were not present when the peremptory challenges were actually made, they were present during most of the voir dire, and they had the opportunity to speak with their attorneys with respect to the section of the voir dire they did not attend. Therefore, each defendant had the opportunity to discuss with counsel and to inform the district Judge concerning any prospective juror, and counsel met with the Judge to exercise the challenges. We hold that the defendants have failed to make a specific showing of prejudice resulting from this error.
 
 J. Race-Based Peremptory Challenges
 
 105
 Defendants' next claim, presented by Chad Gibbs, see Br. of Def. Chad Gibbs at 10-12, is that the prosecution impermissibly used five of its eight peremptory challenges against African-American jurors in violation of the Equal Protection Clause of the Fourteenth Amendment. The government struck three African-Americans with its six initial peremptory challenges. The government then used both of its peremptory challenges for the alternate jury pool to strike African-Americans. Chad Gibbs's attorney objected to each challenge of an African-American juror, and the district court overruled each objection.
 
 
 106
 In Batson v. Kentucky, 476 U.S. 79 (1986), the Supreme Court held that the Equal Protection Clause forbids race-based peremptory challenges. To establish a violation of equal protection under Batson, the defendant must first make a prima facie showing that the prosecutor exercised peremptory challenges based on race. Id. at 96-98. The burden of persuasion then shifts to the prosecution to articulate race-neutral reasons for the strikes. Id. The prosecutor must convey a reason that is "clearand reasonably specific." Id. at 98. If, as here, the district court rules on the prosecutor's explanation, the requirement that the defendant make a prima facie showing of race-based peremptory challenges becomes moot. See Hernandez v. New York, 500 U.S. 352, 358-59 (1991) (plurality opinion); United States v. Tucker, 90 F.3d 1135, 1142 (6th Cir. 1996).
 
 
 107
 When the district court rules on a prosecutor's explanation for a peremptory challenge after an objection to the challenge, "the question... boils down to whether the appellants established by a preponderance of the evidence that the peremptory strikes were intentionally discriminatory." Tucker, 90 F.3d at 1142. We review for clear error all factual findings by the district court on this issue. See United States v. Hill, 146 F.3d 337, 341 (6th Cir. 1998); Tucker, 90 F.3d at 1142. The prosecutor's reason for the strike need not be sufficient to challenge for cause, but the prosecutor may not rely on his assurances of good faith. See Batson, 476 U.S. at 97-98.
 
 
 108
 The prosecution struck an African-American woman with its first peremptory challenge. See J.A. at 449. Gibbs's lawyer objected. See J.A. at 449-50. After arguing that defense counsel had not established a prima facie case, the prosecutor explained that the juror stated in her questionnaire that she knew Derrick Russell, one of the original defendants named in the indictment, and that she knew two of the cooperating witnesses' attorneys. See J.A. at 450-51. The district court then overruled Gibbs's objection. See J.A. at 451. The prosecution used its second peremptory challenge to strike an African-American man. See J.A. at 451. Gibbs's attorney objected. See J.A. at 451. When asked for his reasons, the prosecutor explained that he knew the juror because the juror worked in the prosecutor's office building, but the juror had not responded when asked if he knew any of the counsel in the room. The prosecutor was also concerned that the juror was too familiar with the case because he had worked in the building during the indictment stage, and finally the prosecutor was concerned that the juror was an older man who had been living with his parents for eleven years. See J.A. at 452-54. The district court held its ruling in abeyance. See J.A. at 454. The prosecutor also used his fourth peremptory challenge to strike an African-American man. See J.A. at 456. Gibbs's attorney objected. See J.A. at 456. The prosecutor explained that the juror wrote in his questionnaire that he knew a number of defendants named in the initial indictment, including Needum. The juror worked and became acquainted with certain of the defendants at a detention center. See J.A. at 456. The district court found this to be a permissible ground for a peremptory challenge. See J.A. at 456-57. The district court reconsidered these three strikes and confirmed his decision to overrule the objections, including the one previously held in abeyance, holding that they were not race-based. See J.A. at 458-59. The prosecutor offered specific, race-neutral reasons for each of these three peremptory challenges, and there is nothing in the record to suggest that the district court's decision to overrule the defendants' objections was clearly erroneous.
 
 
 109
 The prosecutor exercised both of his peremptory challenges of alternate jurors against African-Americans. See J.A. at 465-70. Gibbs's attorney objected to both. See J.A. at 466, 470. Apparently relying solely on the juror-prepared questionnaires and unaware that they were African-Americans, the prosecutor claimed that his decision was strategically based on the fact that he sought to have two jurors lower on the list seated, and did not have anything per se against the two he was striking. See J.A. at 467-68, 470. The prosecutor was also concerned that one of the two jurors had no feelings one way or the other about drugs. See J.A. at 470.The district court found that the prosecutor's choices were non-racial and neutral. See J.A. at 468-70.
 
 
 110
 Simply claiming good faith is not an acceptable explanation for striking an African-American juror when the defendants have made a prima facie showing. See Batson, 476 U.S. at 97-98. Furthermore, a tactical explanation that two jurors lower on the list were preferable is inadequate to sustain a challenge. The prosecutor could prefer the other jurors precisely because they were not African-American. It would therefore have been appropriate for the district court to elicit more detail with respect to the prosecutor's alleged tactical decision. However, given that it is not clear that the defendants made a prima facie showing of race-based challenges in light of the fact that the prosecutor was not aware that the two jurors he sought to strike were African-Americans, and given that the prosecutor appears to have made his tactical decision without being aware of the two jurors' race, we hold that the district court's determination was not clearly erroneous.
 
 K. Sentencing Issues
 1. Drug Quantities
 
 111
 Anthony Gibbs, Chad Gibbs, Woods, Needum, Curtis, and Berry challenge the district court's calculation of drug quantities to determine their base offense levels under U.S.S.G. § 2D1.1(a)(3). With the exception of Curtis, each of the defendants was sentenced based only on the drugs directly attributable to him, and was not held accountable for the drug quantities of his co-conspirators. We note a number of problems that the district court must address at the resentencing hearings of each of the defendants. We are particularly troubled by the extent to which the district court relied on the testimony of probation officers who had obtained their information from Andrew Jackson. As is discussed below, a number of the defendants point out that drug calculations attributed to Jackson often were irreconcilable with other statements he had made or were otherwise unreliable.
 
 
 112
 In calculating the base offense level for purposes of sentencing, this court considers the quantities of drugs that were "part of the same course of conduct or common scheme or plan." See United States v. Milledge, 109 F.3d 312, 316 (6th Cir. 1997) (quoting U.S.S.G. § 1B1.3(a)(2)). "The government bears the burden of proving the quantity of drugs chargeable to a defendant for sentencing purposes by a preponderance of the evidence." United States v. Gessa, 57 F.3d 493, 496 (6th Cir. 1995), cert. denied, 516 U.S. 1098 (1996). This court reviews for clear error a district court's drug quantity determinations. See United States v. Berry, 90 F.3d 148, 152 (6th Cir.), cert. denied, - -- U.S. ---, 117 S. Ct. 497 (1996); Gessa, 57 F.3d at 496; United States v. Ward, 68 F.3d 146, 149 (6th Cir. 1995), cert. denied, 516 U.S. 1151 (1996). The district court's findings must have "some minimum indicium of reliability beyond mere allegation." Ward, 68 F.3d at 149 (quoting United States v. Smith, 887 F.2d 104, 108 (6th Cir. 1989) (citation omitted)).
 
 
 113
 Anthony Gibbs argues that 625 of the 682 grams of crack for which the district court held him accountable were improperly included in the district court's calculation. The 625-gram calculation was based solely on statements made at a post-trial private interview between the probation officer who prepared the presentence investigation report and Andrew Jackson, one of the corroborating witnesses. See J.A. at 2031 (Sentencing Hr'g at 10). While recognizing the "wide discretion allowed a trial Judge in considering the evidence submitted at sentencing," United States v. Silverman, 976 F.2d 1502, 1508 (6th Cir. 1992) (en banc), cert. denied, 507 U.S. 990 (1993), Gibbs argues that the districtcourt's determination was clearly erroneous because Jackson's testimony at the jury trial directly contradicted the probation officer's claim.
 
 
 114
 We do not agree that Jackson's trial testimony contradicted the probation officer's statements. When asked: "Did you ever see [Anthony Gibbs] involved in any other type of activity during the month of July of 1993?" Jackson replied: "Just out there selling, just out there like everybody else." J.A. at 783-84. When asked: "[D]o you recall ever seeing him with a particular amount of crack cocaine in July of 1993?" Jackson mentioned one specific incident where Gibbs was holding a bag of about one-half ounce. See J.A. at 783-84. This testimony is not in total contradiction to Jackson's later Discussion with the probation officer. Instead, it could be a result of the lack of thoroughness in the government's examination of the witness. The government only needed to prove at trial that Gibbs possessed with intent to distribute five grams of crack to sustain the conspiracy charge.
 
 
 115
 We are troubled, however, by other statements of the probation officer. The probation officer indicated that she spoke with Jackson the day before the sentencing hearing, see J.A. at 2028 (Sentencing Hr'g at 7), which was held on March 7, 1996. The presentence investigation report, however, prepared months before, already included the 625 grams of crack sales in July of 1993. See J.A. at 2128 (Presentence Investigation Report ("PSR") at ¶ 82). This inclusion is apparently attributable to information provided to the testifying probation officer by other probation officers. See J.A. at 2027. The probation officer's meeting with Jackson was ostensibly meant simply to confirm these figures.
 
 
 116
 Without more evidence at the sentencing hearing, it is questionable whether the district court has shown a minimum indicium of reliability. The district court ruled that "this calculation of relevant conduct has been proved by the testimony beyond a reasonable doubt at the trial and with, at least, the probation officer here today further supporting the amounts in the report." J.A. at 2035. Anthony Gibbs points out, however, that the jury convicted him of violating 21 U.S.C. § 841(b)(1)(B)(iii), which requires a showing of guilty beyond a reasonable doubt for possession with intent to distribute more than five grams of cocaine base. The only evidence with respect to the 625 grams of crack at issue is the testifying probation officer's Discussion with Jackson who testified directly at trial only with respect to one-half ounce (approximately fourteen grams) of crack. The probation officer does not appear to discuss at the sentencing hearing how Jackson came up with the figure of 125 grams of crack per week in July of 1993, nor does the presentence investigation report provide any further basis. See J.A. at 2128 (PSR at ¶ 82). See also United States v. Frazier, 89 F.3d 1501, 1506 (11th Cir. 1996) (holding that extrapolation of drug quantities from general evidence of selling quantities and periods of time is insufficient for sentencing without more specific evidence of the number of transactions and quantities of drug involved), cert. denied sub nom. Hutchison, 520 U.S. 1222 (1997).
 
 
 117
 The district Judge simply found the probation officer credible and presumably accepted the probation officer's determination that Jackson was credible. Although "[t]he sentencing court's use of hearsay information has traditionally been almost unlimited," Silverman, 976 F.2d at 1509, there must be some evidence of reliability. Gibbs does not have a constitutional right to confront Jackson at the sentencing hearing, see Silverman, 976 F.2d at 1511, but we conclude that the district court should have elicited more information from the probation officer regarding her Discussion with Jackson and other probation officers. Cf. United States v. Roberts, 14 F.3d 502, 520-21) (10th Cir. 1993) (expressing concern about the attributionof large drug quantities to defendants at sentencing without satisfactory corroborating evidence). Although the probation officer testified that she confirmed the drug quantities in the presentence investigation report with Jackson, there is insufficient information regarding the unnamed probation officer's or officers' original Discussion with Jackson from which the drug calculations in the presentence investigation report originated. At Gibbs's resentencing hearing, the district court must elicit more information with respect to Jackson's original statements and the source of Jackson's knowledge to determine by a preponderance of the evidence the quantity of drugs for which Gibbs should be held responsible.
 
 
 118
 Anthony Gibbs also argues that because in July 1993 he was only seventeen years old, and the bulk of the relevant conduct with which he is charged occurred at that time, his juvenile status precludes such a sentence and conviction. Although we vacate Gibbs's conspiracy conviction, we hold that the district court on remand may take into account quantities of crack cocaine Gibbs sold before he reached age eighteen as relevant conduct to Gibbs's independent drug trafficking convictions.
 
 
 119
 Under the Sentencing Guidelines, the district court may include, as relevant conduct for sentencing, quantities of drugs "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). As long as the government successfully prosecutes a defendant for a crime that occurred after the defendant reached the age of majority, the district court may consider relevant conduct that occurred before the defendant reached the requisite age as long as such conduct falls within the limitations set forth in § 1B1.3(a)(2). We note however, that because we have vacated Gibbs's conspiracy conviction, the district court may not include as relevant conduct Gibbs's sales of crack in July 1993 as acts committed during the commission of the offense of conspiracy under U.S.S.G. § 1B1.3(a)(1)(A). To be "part of the same course of conduct or common scheme or plan" as Gibbs's convictions on Counts 132 and 182 for possession with intent to sell crack after Gibbs reached the age of majority, the sales in July 1993 must have "at least one common factor" or be "sufficiently connected or related to each other as to warrant the Conclusion that they are part of a single episode, spree, or ongoing series of offenses." See U.S.S.G. § 1B1.3 commentary, applic. note 9.
 
 
 120
 Anthony Gibbs's argument is that most of the crack that was attributed to him was for sales that occurred in July 1993, when he was only seventeen years old. We note that Gibbs's 21 U.S.C. § 841 conviction on Count 55 was for possession with the intent to sell crack in July 1993. Gibbs does not challenge his conviction on Count 55 itself, only the use of this crack as relevant conduct for sentencing. While it is not clear why Gibbs fails to challenge his conviction on Count 55, we point out that under the Federal Juvenile Delinquency Act ("FJDA"), because Gibbs was previously found guilty of possession of fifty unit doses of cocaine as a juvenile, see J.A. at 2130 (PSR), the Count 55 charge against him would be mandatorily transferred to a federal district court for criminal prosecution upon motion of the government. See 18 U.S.C. § 5032; United States v. Welch, 15 F.3d 1202, 1208 n.7 (1st Cir. 1993), cert. denied, 511 U.S. 1076 (1994), and cert. denied, 511 U.S. 1096 (1994). The FJDA would appear to apply to Gibbs's indictment on Count 55 because he was less than twenty-one years of age. See 18 U.S.C. § 5031. Therefore, because Gibbs's conviction on Count 55 appears to be valid, certainly the district court may consider possession and sales of crack cocaine attributable to Gibbs in July 1993 to calculate his sentence.
 
 
 121
 Chad Gibbs argues that 1,599.25 grams of the 1,602.55 grams of crack forwhich the district court held him accountable were improperly included in the district court's calculation. As with Anthony Gibbs, this amount of crack was based on a probation officer's private Discussions with witnesses who had testified at trial. Chad Gibbs argues, like his brother, that the information from the witnesses, Thomas Terry and Andrew Jackson, was inconsistent with their testimony at trial.
 
 
 122
 The probation officer testified that Thomas Terry told him that he met Chad Gibbs in 1990 through Anthony Graves and that he knew that Gibbs was selling crack at the rate of five ounces per week in June and July 1990. See J.A. at 2076-77. At trial, Terry testified that he knew Anthony Graves from their old neighborhood before Terry moved to the Short North, and that he met Chad Gibbs at the same time he met Anthony Graves. See J.A. at 1217, 1222 (Test. of Terry). Terry then moved to the Short North in November 1990 and began selling drugs. See J.A. at 1217-18. Gibbs argues on appeal that Terry testified at trial that he met Graves and Gibbs in November 1990 and therefore could not have met Gibbs in June 1990. Gibbs is misreading the testimony of the probation officer and Terry. The probation officer did not say that Terry told him he met Gibbs in November 1990. See J.A. at 2076. Also, Terry specifically stated at trial that he met Graves before he moved to the Short North in November 1990. See J.A. at 1217. The district court found that this evidence met the preponderance of the evidence standard. See J.A. at 2085. Although it is possible, therefore, that Terry met Chad Gibbs before he moved to the Short North, Terry's testimony at trial strongly indicates that he was not exposed to drug sales and was not aware of drug sales in the Short North until he moved there in the fall of 1990. See J.A. at 1217-18. Upon resentencing, the district court must elicit more specific evidence as to Terry's witnessing of Gibbs's sales of crack in June and July 1990 to meet the preponderance of the evidence standard.
 
 
 123
 Chad Gibbs also argues that evidence taken by the probation officer from private meetings with Andrew Jackson was unreliable. The first argument is that Jackson's statements to the probation officer that Gibbs was selling three-and-a-half to four ounces of crack per week in December 1992 were unreliable. He then says Jackson's statement to the probation officer that Gibbs sold one ounce of crack in July 1993 is unreliable because Jackson stated at trial that Gibbs only possessed one-half ounce of crack. See J.A. at 775 (Test. of Jackson). Gibbs also points out that Jackson agreed that he was "taking a guess" with respect to his drug calculations, see J.A. at 822, and that the oath he took at trial "didn't mean much to [him]." J.A. at 825. Jackson also claimed that he did not know how much crack he himself was selling in 1993. See J.A. at 827. Again, Jackson's testimony is troubling, at times arguably contradictory, and the specific drug amounts were related to the court solely through probation officers. It is doubtful that the prosecution has met the preponderance of the evidence standard. Although the government repeatedly argues that the drug calculations were reasonable and the drug quantities could often have been greater, this does not reduce the burden of proof with respect to the drug quantities in the drug transactions relied upon by the government. Here again, upon resentencing, more specific evidence regarding the source and reliability of Jackson's testimony must appear on the record to support the drug quantity calculations by a preponderance of the evidence.
 
 
 124
 Chad Gibbs also argues that he should not be held responsible for crack sold before he turned eighteen. Again, although we vacate Gibbs's conviction on the conspiracy count, the district court is free to consider relevant conduct related to Gibbs's independent drug trafficking convictions. The district court is, however, limited to conduct that satisfies the requirements of U.S.S.G. § 1B1.3(a)(2).
 
 
 125
 Woods argues that 2,412.65 of the 2,452.35 grams of crack for which the district court held him accountable were improperly included in the district court's calculation. His first claim is that Robert Dotson, whose testimony was accepted by the probation officer to attribute 1,269.15 grams of crack to Woods, see J.A. at 2329 (PSR), was unreliable. The officer did not personally meet with Dotson, J.A. at 2094, but relayed information from his supervisor who did meet with Dotson. See J.A. at 2094. The probation officer also repeatedly stated that he calculated the presentence report quantities conservatively based on Dotson's testimony. Woods points out that Dotson was arguably not always honest during his testimony, see J.A. at 626-29 (saying he did not use drugs during probation but then remembering that he did), that he could not calculate weight of drugs by looking at them, J.A. at 621-22, and that he was not sure how much a kilogram is. See J.A. at 546. Cf. United States v. Robison, 904 F.2d 365, 371-72 (6th Cir.) (holding that a drug user's testimony when she admitted to guessing and felt pressured into guessing was not sufficiently reliable for calculating drug quantities), cert. denied sub nom. Smoot v. United States, 498 U.S. 946 (1990). Upon resentencing the district court must evaluate the government's evidence more closely to ensure that the drug quantities allocated to Woods can be proven by a preponderance of the evidence.
 
 
 126
 Woods also challenges the probation officer's determination that Woods sold one ounce of crack per week for forty weeks between November 1992 and September 1993. The probation officer calculated this amount based on a conservative estimate of the amount of drugs Andrew Jackson told the officer Woods was dealing during this period of time. See J.A. at 2097-98. Woods points out that Jackson testified at trial that he moved to the Short North in December 1992 and moved out in August 1993. See J.A. at 737, 743, 835. These dates are shorter than the time period the probation officer claims Jackson told him he saw Woods selling crack. The district court, however, stated simply "the Court has previously found and continues to find that Mr. Jackson is a reliable source of information as to dealings of the Short North Posse." J.A. at 2107. Once again, a defendant has raised doubt about Jackson's testimony regarding drug quantity, which the district court must consider at its resentencing of Woods.
 
 
 127
 Needum argues that 134 of the 288.2 grams of crack for which the district court held him accountable were improperly included in the district court's calculation. He argues that the government's reliance on the probation officer's Discussions with Terry and Jackson was insufficient for sentencing purposes. As set out above, such hearsay testimony is admissible if it carries minimal indicia of reliability. See Silverman, 976 F.2d at 1510-11. Needum cites trial testimony to indicate that the total amount of drugs Jackson and Terry attributed to him was in the area of 126-154 grams. See J.A. at 1360-63, 751, 776 (Tr. at 2326-27, 2356-57, 1028, 1053). At Needum's sentencing hearing, Needum's lawyer pointed out this discrepancy. See Sentencing Hr'g Tr. at 4-5. The district court simply asked the probation officer if the calculations were accurate, without evoking any detail about the probation officer's meeting with Jackson or Terry. Due to the fact that Needum's case must be remanded for resentencing with respect to his erroneous firearm convictions, and because we have been consistently troubled by the reliability of Jackson as a source for drug quantities, we instruct the district court on remand to explore further the source and reliability of Jackson's and Terry's knowledge of Needum's relevant conduct.
 
 
 128
 Robert Curtis argues that 71.66 of the 76.96 grams of crack for which the district court held him accountable were improperly included in the district court's calculation. Again these calculations werebased on testimony of Jackson and Terry, and also from testimony of Quinton Clausell. Terry testified that he sold drugs to Needum, see J.A. at 1243-45, ostensibly for Needum's cousins, who are Robert and Michael Curtis. See J.A. at 1244-45. Terry then said he just remembered the drugs being for Michael. See J.A. at 1245. There is no evidence that Curtis ever received these drugs or that they were intended for him. The probation officer testified that Terry specifically told him that two baggies of one-quarter ounce each were for Michael and Robert. See J.A. at 2047-48. Without any evidence that Robert Curtis ever received these drugs, Terry's information fails to meet the minimal indicia of reliability test.
 
 
 129
 Robert Curtis then challenges a one-quarter ounce amount of crack that Jackson allegedly saw in Curtis's possession. Jackson testified at trial that he did not know for certain the amount because he was a distance from Curtis. See J.A. at 733. The probation officer testified that Jackson was certain of the amount. See J.A. at 2053-54. Again upon resentencing the district court should review cautiously the reliability of Jackson's information.
 
 
 130
 Curtis challenges a one-quarter ounce quantity of crack he allegedly possessed in 1994. This was based on testimony of Clausell. Curtis further argues that because Clausell testified to being a heavy marijuana user, see J.A. at 719, his testimony was not reliable. We cannot conclude that Clausell's marijuana use alone rendered it clearly erroneous for the district court to hold that this amount was supported by a preponderance of the evidence.
 
 
 131
 Curtis also objects to a.8 gram sale of crack that Needum sold to Agent Russell that was attributed to Curtis because Needum entered Curtis's apartment during a drug transaction and then provided the drugs. Although there was no evidence that Curtis was home, the district court could find, under the preponderance of evidence standard, that it is more likely than not that Needum obtained the drugs from Curtis's apartment and that Curtis had constructive possession over the crack, whether or not he was at home during this transaction.
 
 
 132
 Berry argues that 7 of the 37.675 grams of crack for which the district court held him accountable were improperly included in the district court's calculation. One of the alleged co-conspirators, James Brown, testified at the sentencing hearing that he used to sell crack cocaine with Berry and directly saw him selling one-eighth ounce quantities of crack on a number of occasions. See J.A. at 2004-06. Berry argues that the government should not have been able to introduce Brown's testimony because the government only introduced it after realizing that all of the earlier testimony related to drug sales before Berry's eighteenth birthday. See Br. of Def. Berry at 10. There is nothing in the sentencing hearing to indicate that the government introduced this evidence for improper reasons, and the district court found that Brown's testimony was credible. See J.A. at 2019.
 
 2. Mitigating-Role Reductions
 
 133
 Three defendants, Anthony Gibbs, Needum, and Curtis, argue that the district court erred by not granting them a mitigating-role reduction under U.S.S.G. § 3B1.2 for being minor participants in the offense. Due to the fact that we vacate the conspiracy convictions of each of these defendants, this issue is no longer relevant.
 
 3. Separate Error
 
 134
 Woods argues that the district court erred by including five points in his criminal history score. The government, citing United States v. Organek, 65 F.3d 60, 62 (6th Cir. 1995), and United States v. French, 974 F.2d 687, 697 (6th Cir. 1992), cert. denied, 506 U.S. 1066 (1993), argues that Woods waived this argument because he did notobject before the district court. Although Woods appears to concede this, see Reply Br. of Def. Woods at 16-17, he argues that this inclusion of criminal history points was clearly erroneous and upon remand for resentencing, the district court should reconsider his criminal history score.
 
 
 135
 The government appears to rely on 21 U.S.C. § 851(b), which states that any failure to challenge a prior conviction before the sentence is imposed constitutes waiver of the issue. See Organek, 65 F.3d at 62. Woods, however, does not challenge the prior convictions; instead he contests the district court's calculation of the date he joined the conspiracy. We therefore review this issue for plain error.
 
 
 136
 The probation officer assessed three criminal history points to Woods for juvenile petit theft convictions when he was ten to eleven years old under U.S.S.G. § 4A1.2(d)(2)(B), see J.A. at 2331-32 (PSR at ¶¶ 94, 95, 97), and two points under § 4A1.1(e) because Woods allegedly joined the conspiracy within two years of release from confinement. See J.A. at 2337 (PSR at ¶ 111).
 
 
 137
 Dotson and Crockett testified that they first saw Woods selling crack in 1991, see J.A. at 490-92 (Test. of Dotson); J.A. at 1600-02, 1604-07 (Test. of Crockett), but that the conspiracy began in 1989. See J.A. at 483-89 (Test. of Dotson); J.A. at 1597-98 (Test. of Crockett). The probation officer concluded that Woods joined the conspiracy in 1990, when he was arrested for possession of crack and carrying a concealed weapon. See J.A. at 2337 (PSR at 21 ¶ 111). Woods argues that he cannot be found to have joined the conspiracy until 1991, because the founders of the SNP did not even see him selling before then. Woods's theory would render erroneous the sentence enhancements under U.S.S.G. §§ 4A1.1(e) and 4A1.2(d)(2)(B). The district court, however, found that the 1990 arrest constituted a "reasonable determination of when the defendant first became involved with the Posse." Sentencing Hr'g Tr. at 4.
 
 
 138
 The district court may consider any relevant conduct in determining the "commencement of the instant offense" for purposes of computing enhancements for criminal history. See U.S.S.G. § 4A1.2 commentary, applic. note 8. For the 1990 arrest to constitute relevant conduct, it must either be found to be an act "during the commission of the offense of conviction" under U.S.S.G. § 1B1.3(a)(1)(A) or, because each of the three Counts on which Woods was convicted was for an offense that requires grouping of counts under U.S.S.G. § 3D1.2(d), an act that was "part of the same course of conduct or common scheme or plan as the offense of conviction" under U.S.S.G. § 1B1.3(a)(2).
 
 
 139
 The 1990 sale is included as relevant conduct under U.S.S.G. § 1B1.3(a)(1) in the presentence investigation report. See J.A. at 2329-30 (PSR at ¶¶ 83, 85). The 1990 sale did not occur "during the commission of the offense of conviction" on Counts 125 or 146, both of which were based on drug transactions in 1994. The probation officer must, therefore, have considered the 1990 sale to have occurred during the commission of the conspiracy offense. The fact that Woods possessed crack in the Short North in 1990, however, does not alone render the 1990 possession during the commission of the conspiracy offense, as the district court appears to have concluded. If, at resentencing, the government maintains this position, the government must show by a preponderance of the evidence that Woods was a member of the conspiracy at the time he was arrested in 1990 for possession of crack cocaine and a firearm.
 
 III. CONCLUSION
 
 140
 For the reasons stated above, we: AFFIRM the conviction of Woods on Count 1, and VACATE the conviction of each of the other defendants on Count 1; AFFIRM Curtis's conviction on Count 102 and REVERSE Curtis's conviction on Count 103; AFFIRM Chad Gibbs's convictions onCounts 46, 91, 109, 148, 154, 160, 184 and 185; AFFIRM Needum's convictions on Counts 47, 92, 96 and 102, and REVERSE Needum's convictions on Counts 97 and 103; AFFIRM Anthony Gibbs's convictions on Counts 55, 119, 132, 133 and 182; AFFIRM Woods's convictions on Counts 125 and 146, and REVERSE Woods's conviction on Count 147; AFFIRM Hough's convictions on Counts 81 and 82; and AFFIRM Berry's conviction on Count 151. We VACATE the sentence of each of the defendants and REMAND to the district court for resentencing. In light of the multiple issues related to each defendant's case, the resentencing hearings will be de novo.
 
 
 
 NOTE:
 
 
 [1]
 The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation.