**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Rene Antonio APONTE, Defendant–**
**Appellant.**

**No. 00–1106.**

United States Court of Appeals,
Sixth Circuit.

Aug. 27, 2001.

214

Before BOGGS, DAUGHTREY, and FARRIS, Circuit Judges.*

---

* The Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

PER CURIAM.

In this drug case appeal, the defendant challenges the validity of his convictions and sentence under the Controlled Substances Act and the Travel Act. Upon review, we affirm the convictions as adequately supported by the evidence adduced at trial. As for the sentence, we affirm in part, vacate in part, and remand for reconsideration, pursuant to *United States v. Ramirez*, only that portion of the sentence relating to the term of supervised release.

**I**

Upon her husband's incarceration in 1993, Sylvia Torres–Benitez took over his business of supplying cocaine to wholesalers in eastern Michigan. In October 1997, she met Rene Antonio "Tony" Aponte at Jennie's Lounge in Flint, Michigan, where she was a regular customer. Aponte struck up a conversation with her and quickly moved the discussion to her ability to supply cocaine, suggesting that he might have people with whom he could connect her. They maintained an intimate relationship in Michigan for the next few weeks, until Aponte suggested that they travel together to Rochester, New York, where much of his family lived. During their weekend visit, Aponte introduced her to his family, including his brother-in-law Nelson Castro. Before returning to Michigan, Torres–Benitez discussed selling kilogram quantities of cocaine to Castro and a business associate of his known only as "Mexico." She also obtained Castro's home and cellular telephone numbers. Upon their return, Torres–Benitez broke off her personal relationship with Aponte.

Approximately two weeks later, Torres–Benitez drove to McAllen, Texas, to visit family and pick up cocaine from her supplier. Having collected her stock, Torres–Benitez was traveling north when a county sheriff stopped her and found cocaine in her car. Though it was her first arrest, Torres–Benitez quickly decided to cooperate, and the sheriff put her in contact with the federal Drug Enforcement Administration.

Back in Michigan, Torres–Benitez told DEA agents in Saginaw about the conversations she had with Castro and Mexico the previous fall, but they did not immediately develop a plan for a sting operation. Then, in January 1998, Aponte came to Torres–Benitez's house in Flint and asked whether she could supply him with drugs. Telling Aponte that she was calling her supplier in Texas, Torres–Benitez actually called Agent Cary Freeman at his DEA office. Freeman later reported being surprised to receive a call asking him to supply cocaine, but he caught on quickly and started spinning a yarn. When Torres–Benitez turned the phone over to Aponte, he spoke with agent Freeman for a few minutes about the price and availability of cocaine.

In March 1998, Aponte's employer transferred him from Michigan to Rochester, New York. Then, at the DEA's direction, Torres–Benitez made tape-recorded telephone calls—three were played for the jury—to Castro to set up a cocaine transaction. In a series of conversations, they discussed various quantities, prices, and delivery points. Torres–Benitez identified a voice heard in the background as Aponte's. At one point, she offered to "front" Castro up to five kilograms if he paid cash for two kilos, but Castro resisted, explaining that he could not afford to pay for two kilos right away and did not want to transport that much. As Castro haggled over prices and delivery dates, Aponte could be heard in the background complaining that one planned pick-up trip conflicted with his work schedule. When negotiations hit an impasse over the amount to be paid up-front and the num-

ber of kilograms to be delivered, Aponte said, in reference to Torres–Benitez's "supplier" who was evidently controlling the deal: "Tell him to quit being an asshole." At this point, Torres–Benitez decided to turn the negotiations over to her "supplier," agent Freeman.

Beginning on March 23, 1998, agent Freeman made a series of calls—some recorded and played for the jury—to Castro to negotiate. In one of these, Castro indicated that he "would like to start with ten" kilograms and could come up with enough cash to pay for two. By this time, they had settled on a price of $16,000 per kilogram, if Castro picked up the cocaine in Michigan.

On the night of April 2–3, 1998, Castro and Aponte left Rochester and drove through Canada to reach Michigan. They expected to purchase the cocaine from Torres–Benitez, but she reported that she could not pick up the drugs in time and told them to deal directly with her supplier. Castro then spoke with Freeman by cellular telephone, and he directed the travelers to a Super 8 Motel in Birch Run, Michigan. Castro and Aponte arrived at 3:00 a.m. and went into Freeman's motel room, while DEA agents and state police captured the events both outside and inside the room on videotape.

Shortly after their arrival, Aponte asked to use the bathroom. While Aponte used the facilities, agent Freeman called for a sample of cocaine to be delivered, and a state police lieutenant brought a package to the door. The package contained 999.5 grams of cocaine. Freeman handed it to Castro, who asked for a knife so he could test it. Castro punctured the package, put a few grains on the knife and tasted it. Castro was not experienced in testing cocaine and had been instructed by Mexico to have Aponte test and approve the drugs they were buying, so he nodded toward the bathroom and told agent Freeman, "Wait 'til he comes out.'" Aponte finally emerged and went to the bed where the package lay open. He declined the offer of a knife and tested the cocaine by wetting his finger, taking a sample, and putting it on his tongue. Aponte nodded, indicating approval, and Castro said: "He likes it." The group then began discussing money.

After getting keys to the car from Aponte, Castro left the room for a few minutes and returned with a gym bag. Although Castro was supposed to pay for two kilograms up front and take another two on consignment, Mexico, who provided the financing, advanced Castro only $20,000. From the gym bag, agent Freeman removed a smaller plastic bag containing the money. He quickly reviewed nineteen bundles of bills in various denominations, then said he trusted Castro. Freeman and Castro agreed that Freeman would provide a total of four kilograms that day, with the rest of the money, $44,000, due within a week or two.

Shortly after Freeman called for another three kilograms to be delivered to the room, agents rushed in to arrest Castro and Aponte. The DEA seized the $20,000 in buy money and more than $1000 in cash from Castro; it did not seize a note Aponte had written to his son or the $20 placed in the note. When he was arrested, Castro told the police that Aponte was not involved. Aponte protested that he accompanied Castro to Michigan because he wanted to see his oldest son and daughter, who lived in the Flint area.

On September 30, 1998, a grand jury handed up a two-count indictment that, as amended by order of the court, charged Nelson Castro and Rene Antonio Aponte with conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846, and travel in interstate commerce with the

intent to establish or carry on a business enterprise involving controlled substances in violation of the laws of the United States, in violation of 18 U.S.C. § 1952(a)(3). Castro pled guilty to the conspiracy charge and cooperated with the government, eventually testifying against Aponte at his trial. On September 22, 1999, a jury convicted Aponte of both charges. Aponte filed no objections to the Pre–Sentence Report (PSR), and the district court, accepting the facts and calculations presented in the PSR, sentenced Aponte to 97 months of imprisonment on Count 1, concurrent with 60 months of imprisonment on Count 2, and four years of supervised release on Count 1, concurrent with three years on Count 2. Aponte timely appealed.

## II

Aponte challenges the sufficiency of the evidence on which the jury convicted him, claiming, with respect to both counts, that nothing presented at trial connected him to the drug conspiracy. On appeal, this court must decide "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original); *United States v. Evans*, 883 F.2d 496, 501 (6th Cir.1989). This standard applies to both direct and circumstantial evidence, *see United States v. Meyers*, 646 F.2d 1142, 1143 (6th Cir. 1981), and the court will draw all reasonable inferences in favor of the government. *See United States v. Avery*, 128 F.3d 966, 971 (6th Cir.1997); *United States v. French*, 974 F.2d 687, 695 (6th Cir.1992).

To establish a drug conspiracy in violation of 21 U.S.C. § 846, the government must prove beyond a reasonable doubt:

"1) an agreement to violate drug laws, 2) knowledge and intent to join the conspiracy, and 3) participation in the conspiracy." *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir.1999); *see also United States v. Layne*, 192 F.3d 556 (6th Cir.1999). "[T]he government must prove that the defendant was aware of the object of the conspiracy and that he voluntarily associated himself with it to further its objectives.... The defendant need not be an active participant in every phase of the conspiracy, so long as he is party to the general conspiratorial agreement." *Gibbs*, 182 F.3d at 421 (quotations and citations omitted). "The existence of a connection to the conspiracy must be shown beyond a reasonable doubt, but the importance of the connection need not be great." *United States v. Betancourt*, 838 F.2d 168, 174 (6th Cir.1988). "Proof of a formal agreement is not required; it must only be proven that the members of the conspiracy had at least a tacit or material understanding to try to accomplish an unlawful goal." *United States v. French*, 974 F.2d 687, 696 (6th Cir.1992). The agreement, intent to join it, and participation can all be inferred from acts done with a common purpose. *See United States v. Hughes*, 891 F.2d 597, 601 (6th Cir.1989).

Aponte argues that "the record is devoid of evidence showing [he] had knowledge of, intended to join, or participated in the conspiracy," Def. Br. at 16, because he merely drove to Michigan with his brother-in-law and presence, without intention to participate, is not enough to prove that he entered into the conspiratorial agreement. His only connection to the conspiracy, he claims, "was that he took his girlfriend ... to New York to meet his family in November 1997," at which time he introduced her to his brother-in-law. He claims that he was not present during discussions between Torres–Benitez, Castro, and Mexico,

and points out that Torres–Benitez broke off her relationship with him when they returned to Michigan. He notes, further, that he last spoke to Torres–Benitez in January 1998, while the conspiracy charged in the indictment lasted only from March 12 to April 4, 1998. Despite Torres–Benitez's testimony that she overheard Aponte contributing to Castro's tape-recorded conversations with her about cocaine prices, availability, and delivery options, Aponte claims that "he was not involved in these calls or the agreement to buy cocaine...." Def. Br. at 18. In his view, the fact that the tape recorded conversations were solely between Castro, Torres–Benitez, and agent Freeman shows he was not involved in negotiating to buy cocaine. Aponte stresses that he learned of his April 1998 trip from Castro on the day they left and that he agreed to help Castro by showing him where Torres–Benitez lived (her home was, apparently, the original agreed-upon delivery point) only so he could visit his children.

■ Of course, Aponte neglects a great deal of evidence connecting him to the conspiracy, including, arguably, his own testimony. Still, this court need not decide whether Aponte's admission on the stand that he knew why Castro was going to Michigan before they left and learned more details of the transaction while en route would permit a jury to conclude that he was "aware of the object of the conspiracy and that he voluntarily associated himself with it to further its objectives." *Gibbs,* 182 F.3d at 421. Ample other evidence, including testimony given by a co-conspirator, demonstrates his knowledge of and participation in the conspiracy to further its objects, such that a jury could rationally conclude that he intentionally joined the conspiratorial agreement.

On occasions ranging from their first meeting in October 1997 to their final conversation in January 1998, Aponte asked Torres–Benitez if she could supply cocaine. As she testified, they took their "meet the parents" trip to Rochester in November for purposes of discussing with Castro a multi-kilogram cocaine transaction. As the tape recordings played for the jury revealed, while Torres–Benitez and Castro negotiated their deal, Aponte was heard in the background discussing his ability to accompany Castro to Michigan, correcting Castro's arithmetical errors in subtracting the amount of "up front" money from the total cost of two kilograms of cocaine to determine the amount still due, and expressing his frustration with Torres–Benitez's supplier's demand for more "up front" money.[1] In his testimony, Castro confirmed that Aponte was present when he negotiated with Torres–Benitez by telephone, that Aponte listened to the conversation and also participated in it. Castro insisted, however, that Aponte was not involved with buying the drugs, insofar as he never said, "Yeah, let's go buy this." And, of course, Aponte participated by testing the cocaine and indicating his approval. A jury could rationally conclude from this series of acts, *admittedly* done with the purpose of facilitating Castro's endeavor to purchase cocaine and transport it back to Rochester, that Aponte knew of, intended to join, and associated himself with a conspiracy to violate federal drug laws.

In addition to this circumstantial evidence, direct evidence of Aponte's participation in the conspiracy came in the form of Castro's testimony that they had reached an agreement to traffic in cocaine. Castro testified that Aponte agreed, before they left Rochester, to accompany Castro

---

1. Testifying in his own defense, Aponte claimed not to remember participating in any

of these conversations and denied helping Castro with his arithmetic.

to Michigan to pick up cocaine from Torres–Benitez. They agreed to divide equally whatever money Mexico gave Castro when they brought the cocaine back to Rochester. And, according to Castro, Aponte agreed to test the cocaine before they purchased it.[2] From this evidence, too, a rational trier of fact could conclude that Aponte entered into an agreement to violate federal drug laws. The district court did not, therefore, err in denying Aponte's FED. R.CRIM. P. 29 motion for judgment of acquittal on the 21 U.S.C. § 846 charge.

■ With respect to Count 2 (travel in interstate commerce with the intent to establish or carry on a business enterprise involving controlled substances in violation of federal law), Aponte contends that "the evidence presented quite clearly demonstrated that [his] reason[s] for traveling with ... Castro were to help him find his old girlfriend's ... home and to visit his son and daughter...." Def. Br. at 20. Although he offered separate argument on Count 2, resolution of this claim essentially depends upon the analysis for his drug conspiracy conviction. While a defendant's not participating in a drug conspiracy would tend to defeat a charge that he traveled in interstate commerce with intent to carry on an illegal drug enterprise, sufficient evidence to support a drug conspiracy conviction necessarily demonstrates a Travel Act violation if the defendant traveled in interstate commerce while engaged in the conspiracy. For the reasons set forth above, the jury could rationally conclude that Aponte intended to establish or carry on a conspiracy to dis-

tribute cocaine for profit. Since Aponte admitted intentionally traveling from Rochester, New York, to Birch Run, Michigan, the jury could rationally conclude from the evidence at trial that he "traveled in interstate commerce with the intent to commit an unlawful act while so traveling and did attempt or commit the act." *United States v. Schultz*, 855 F.2d 1217, 1222 (6th Cir.1988) (setting forth the elements of a Travel Act violation and holding that "[p]romotion of unlawful activity ... need not be the sole or dominant purpose of the interstate travel").

### III

Aponte argues that the district court erred in holding him accountable for four kilograms of cocaine for sentencing purposes because Castro brought to the motel room only $20,000, which was enough to purchase just 1.25 kilograms at the agreed-upon price. He also notes that Castro had a "hard time" coming up with the $20,000 and that the DEA brought less than one kilogram of cocaine to the motel room on the night of the sting.[3] He asserts that the government put on no evidence relating to the scope of his conduct in the conspiracy other than the money and drugs present in the motel room, and from this assertion concludes that he should be held accountable for no more than 1.25 kilograms of cocaine. In effect, then, Aponte argues that the district court's findings with respect to the drug quantity were based on insufficient proof and therefore clearly erroneous. He raises this issue for the first time on appeal, as

---

**2.** Aponte admitted driving to the motel with knowledge that Castro intended to purchase drugs there. He denied agreeing to taste-test the cocaine and claimed that he did so at Castro's suggestion only because he was nervous and wanted to get things moving so they could leave.

**3.** The government assured this court at oral argument that it has access to unlimited supplies of cocaine and could have brought for sale as much as Castro was willing to buy.

he did not object to the PSR's calculation of the drug quantity within the scope of his offense conduct.

An objection that an appellant failed to preserve in the trial court is deemed forfeited, and thus non-cognizable upon review, unless the challenged action of the trial court constituted "plain error." FED. R.CRIM. P. 52(b); *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *United States v. Saucedo*, 226 F.3d 782, 787 n. 10 (6th Cir.2000). "To establish plain error, a defendant must show (1) that an error occurred in the district court; (2) that the error was plain, *i.e.*, obvious or clear; (3) that the error affected defendant's substantial rights; and (4) that this adverse [effect] seriously [undermined] the fairness, integrity or public reputation of the judicial proceedings." *United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir.1998) (citations omitted); *see also United States v. Hayes*, 171 F.3d 389, 391–92 (6th Cir.1999) (explaining that the reviewing court's exercise of power to notice and correct procedurally forfeited plain errors which have adversely affected the appellant's substantial rights is entirely discretionary).

■ Under the guidelines, a defendant's base offense level for a drug crime depends on the amount of drugs within the scope of his relevant offense conduct. *See* USSG § 1B1.3(a), 2D1.1(a)(3).

> In the case of a jointly undertaken criminal activity, [USSG § 1B1.3](a)(1)(B) provides that a defendant is accountable for the conduct (acts and omissions) of others that was both: (i) in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that criminal activity.... With respect to offenses involving contraband (including controlled substances), the defendant is accountable for all quantities of contraband with

which he was directly involved and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook.

USSG § 1B1.3, comment. (n.2). The evidence adduced at trial and the facts described in the PSR demonstrated that Aponte joined a conspiracy to purchase, with cash or on a consignment basis, kilogram quantities of cocaine and transport it from Michigan to New York for distribution. The videotape played at trial showed his direct participation in critical steps of the sale, insofar as he tasted the cocaine sample and nodded approval to his co-conspirator, who proceeded to agree, in slight modification of earlier negotiations, that they would take four kilograms of cocaine, paying $20,000 in cash immediately and the $44,000 balance within a week or two. Aponte's voice was heard on audiotapes of conversations that took place long before he went to Michigan, in which he corrected Castro's calculation of sums to be paid "up-front" and "after delivery" as part of a two-kilogram sale. On this evidence, the district court could have reasonably concluded, by a preponderance of the evidence, that the four kilograms Castro agreed to accept was an amount reasonably foreseeable to Aponte as within and in furtherance of the conspiracy. The district court, therefore, committed no error.

## IV

The district court's finding that Aponte's relevant offense conduct was an agreement to purchase for distribution four kilograms of cocaine placed him at offense level 30. *See* USSG § 2D1.1(c)(5). The district court applied no adjustments to the offense level. Aponte had a single criminal history point, placing him in Criminal His-

tory Category I. On the longer of the two concurrent sentences, the court imposed a sentence at the bottom of the 97–121 month guidelines range and additionally imposed a four-year term of supervised release. With respect to Count 1, the jury convicted Aponte of conspiracy to violate federal drug laws, in violation of 21 U.S.C. § 846, which essentially incorporates the substantive offense of unlawful possession with intent to distribute controlled substances, *see* 21 U.S.C. § 841(a), and that statute's sentencing provisions, *see* 21 U.S.C. § 841(b). The statutory penalty range for a conspiracy to possess with intent to distribute more than 500 grams of cocaine is 5–40 years of imprisonment, *see* 21 U.S.C. § 841(b)(1)(B), while the range for an amount of cocaine less than 500 grams is 0–20 years, *see* 21 U.S.C. § 841(b)(1)(C).[4]

■ Aponte argues, again for the first time on appeal,[5] that his sentence violated the rule of *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." In *United States v. Page*, 232 F.3d 536, 543 (6th Cir.2000), this court confronted a situation similar to Aponte's. There, the district court found, by a preponderance of the evidence, the amount of crack the defendant had distributed, and the court imposed a guidelines sentence in excess of 20 years because the amount attributed to the defendant brought him within the 5–40 year range

specified by § 841(b)(1)(B). While this court did not apply *Apprendi* to findings made for purposes of *guidelines* calculations, we noticed plain error in sentencing the defendant to a term exceeding the *statutory* maximum for the crime of which the jury convicted him, §§ 841(a)(1) and 841(b)(1)(C), and vacated the sentence. *See Page*, 232 F.3d at 544–45. In this case, Aponte's guidelines sentence was 97 months, well below the 20–year maximum of § 841(b)(1)(C).

■ Some of our cases have applied *Apprendi* to a sentence not exceeding the statutory maximum of a particular drug's lowest sentencing provision. *See, e.g., United States v. Ramirez*, 242 F.3d 348, 351–52 (6th Cir.2001) (vacating sentence when the district court imposed a 20–year sentence, which is the top of the statutory range for the cocaine catch-all provision, § 841(b)(1)(C), but the bottom of the range the district court found by a preponderance applied to the defendant, § 841(b)(1)(A)). This court has since held that *Ramirez* does not apply when the sentence imposed pursuant to the guidelines and supported by appropriate findings of fact is below the statutory maximum of the catch-all provision, § 841(b)(1)(C), and above the mandatory minimum of the higher range, here § 841(b)(1)(B). *See United States v. Garcia*, 252 F.3d 838, 843–44 (6th Cir.2001); *see also Stafford*, 258 F.3d at 479 n. 9. Accordingly, the prison term in Aponte's sentence offends neither *Apprendi* nor this court's *Ramirez* rule.

---

**4.** For Count 2, a violation of 18 U.S.C. § 1952(a)(3)(A), the statutory maximum term of imprisonment is five years.

**5.** Under these circumstances, plain error review applies. An *Apprendi* violation rises to the level of plain error only when the defen-

dant's sentence exceeds the maximum possible sentence that could be imposed by statute absent the offending sentencing factor determined under the too-lenient preponderance standard. *See United States v. Stafford*, 258 F.3d 465 (6th Cir.2001).

■ Having had the opportunity to review this court's caselaw interpreting *Apprendi* before oral argument, Aponte's counsel conceded that the imprisonment component of his client's sentence did not violate the rule of *Apprendi.* Counsel then refined his argument, advancing one not yet squarely addressed by this court: the total term of supervised release the district court imposed on Aponte, four years, violates the *Ramirez* rule. The cocaine catch-all provision, § 841(b)(1)(C), specifies that district courts must impose a term of supervised release of at least three years on any defendant sentenced to imprisonment, implicitly authorizing any supervised release term between three years and life. Section 841(b)(1)(B) has a parallel provision that requires a term of supervised release of not less than four years. As Aponte's counsel argued, *Ramirez* effectively requires this court to infer from the district court's supervised-release sentence at the bottom of the higher, § 841(b)(1)(B), statutory range that the district court believed itself compelled to impose at least that sentence, even though the crime of conviction, *see* §§ 841(a)(1) and 841(b)(1)(C), authorized a shorter term. Accordingly, we exercise our discretion to notice plain error in sentencing, *see Page,* 232 F.3d at 544–45, vacate the portion of the judgment of sentence imposing a term of supervised release based on the Count 1 conviction, and remand with instructions to re-sentence Aponte, under § 841(b)(1)(C), to a term of supervised release of not less than three years nor more than life.[6] *See United States v. Velasco–Heredia,* 249 F.3d 963, 968–69 (9th Cir. 2001); *cf. United States v. Tolbert,* 8 Fed. Appx. 372 (table), No. 99–6007, 2001 WL 345482 (March 29, 2001). Since we have already determined that the guidelines-dic-

tated sentence of imprisonment was consistent with *Apprendi* and *Ramirez,* we remand only for reconsideration of the term of supervised release.

## V

Aponte submits that "the sentencing court erred by not considering a downward departure due to the sentencing entrapment which occurred relative to [the] quantity of cocaine." Aponte acknowledges this court's holding that a district court's decision not to depart when it was aware of its discretion is unreviewable on appeal. *See United States v. Jennings,* 83 F.3d 145, 152 (6th Cir.1996). Yet he also cites the plain error standard of review because, after contending that the facts present "a clear case of sentencing entrapment," he submits that the district court's "failure to consider such a departure is reversible error, and warrants a new sentencing proceeding." Def. Br. at 24. Put another way, Aponte never sought– until he filed his brief in this court– a downward departure on the basis of sentence entrapment, and he presently blames the district court for not *sua sponte* departing on the basis of alleged sentence entrapment.

■ While a court "cannot categorically exclude any non-prohibited factors from consideration for a downward departure," *U.S. v. Coleman,* 188 F.3d 354, 356 (6th Cir.1999) (en banc), it necessarily must determine what kind of conduct constitutes grounds for a downward departure. If facts supposedly warranting a downward departure have never been called to the district court's attention, the court did not have the opportunity to exercise its discretion. This court will not conduct an initial review of the record to determine whether a case may warrant an exercise of a lower court's discretion because doing so would,

---

**6.** We leave undisturbed the supervised release sentence as to Count 2 because 18 U.S.C. § 3583(b)(2) authorizes up to three years, precisely the term imposed by the district court.

as Aponte attempts to do in this case, result in defendants routinely raising these grounds for the first time on appeal, possibly winning remand for consideration of issues not presented in the first sentencing hearing. Such a result would essentially give such defendants a second (or successive) bite at the downward departure apple when ideas occur for the first time on appeal or, worse yet, when defendants decide to engage the government in endless litigation of sentences by reserving good departure arguments for appeal. Moreover, if the district court had been given the opportunity to exercise its discretion on the record– there is no way to tell if the district court did, in fact, consider the matters Aponte presently raises in determining his sentence within the guidelines range– and overruled the defense's request, he would have no right to appeal and this court would have no jurisdiction to hear any arguments he raised concerning the court's exercise of its discretion. *See United States v. DeSantis,* 237 F.3d 607, 613 (6th Cir.2001). Accordingly, we hold that plain error review does not apply and a defendant has no right to appellate review (to the extent it can be called review) of a district court's failure to depart downward when the defendant did not first seek a downward departure on the asserted basis in the district court.

### VI

For the reasons set forth above, we **AFFIRM** the defendant's conviction. We also **AFFIRM** the defendant's sentence, except insofar as it imposes a term of supervised release of four years. We **VACATE** the supervised release portion of the sentence based on Count 1 and **REMAND** for resentencing consistent with this opinion.